Kenneth Stohner, Jr.
State Bar No. 19263700
JACKSON WALKER L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 953-6000 - Telephone
(214) 661-6803 – Telecopier

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| PROTOM INTERNATIONAL, INC. | § | CASE NO. 15-32065-BJH-11 |
| PROTOM INTERNATIONAL, LLC | § | CASE NO. 15-32066-SGJ-11 |
| | § | |
| DEBTORS. | § | CHAPTER 11 |
| | § | |

### DEBTORS' EXPEDITED MOTION FOR AN ORDER APPROVING THE PROCEDURES FOR (A) THE SALE OF SUBSTANTIALLY ALL ASSETS, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) THE ESTABLISHMENT OF CURE AMOUNTS, (II) APPROVING THE FORM OF NOTICE, AND (III) SETING A HEARING DATE FOR THE APPROVAL OF THE SALE, AND (IV) GRANTING RELATED RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

ProTom International, Inc. ("**PII**") and ProTom International, LLC ("**PILLC**"), the above-captioned debtors and debtors-in-possession (the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby move this Court pursuant to sections 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for an order (I) approving the procedures for (a) the sale of substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code (the "**Sale Procedures**"), (b) the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code, (c) the establishment of cure amounts,

(II) setting a hearing date for the approval of the sale (the "***Sale Hearing***") and (III) approving the form of notice of the Sale Hearing (the "***Motion***"). In support of this Motion, the Debtors respectfully represent as follows:

## I.
## BACKGROUND

**A.      The Chapter 11 Filing**

1.      On May 12, 2015, (the "***Petition Date***"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101 et seq., as amended (the "***Bankruptcy Code***"). The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      A creditors' committee (the "***UCC***") has not been appointed in these chapter 11 cases by the United States Trustee. No trustee or examiner has been appointed in the Chapter 11 Cases.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006.

**B.      Background and Business Operations**

5.      PILLC was formed in April 2007, for the purpose of negotiating and entering into an agreement with ZAO ProTom, a company established under the laws of the Russian Federation ("***ZAO***"), and its sole owner, Vladimir E. Balakin ("***Balakin***"), which would afford the PILLC the exclusive rights to sell the compact accelerator developed by Balakin and used in proton therapy treatment of patients ("the ***ZAO System***") and to obtain a license to use

technology supporting the ZAO System (the "***ZAO Technology***").  The ZAO System and the ZAO Technology was identified as a major component necessary for a proton therapy system that was lighter and less expensive than proton therapy systems then in operation in the United States, without reducing the quality and efficiency of patient treatment.  This technology has been the basis on which PII has developed its Radiance 330® Proton Therapy System (the "***Radiance 330***").

6.      An original agreement was entered into between ZAO, Balakin and PILLC on November 15, 2007.  The original agreement was superseded by an Amended and Restated Agreement dated April 22, 2008, which, as amended, remains in place (the "***ZAO Agreement***").  Under the terms of the ZAO Agreement, PILLC, subject to conditions specified in the ZAO Agreement, has the exclusive right to purchase ZAO Systems and use the ZAO Technology for patient treatment in the United States.

7.      PII was formed in 2008 as a vehicle to further develop and commercialize the ZAO System and the ZAO Technology.  PILLC and PII are parties to an Amended and Restated Rights Agreement dated March 15, 2011 (the "***Rights Agreement***").  Under the terms of the Rights Agreement, PILLC assigned to PII PILLC's right to purchase directly from ZAO the ZAO System and the rights to the ZAO Technology and to re-sell the ZAO System and the right to use the ZAO technology to third parties in the United States.

8.      Under the Rights Agreement, PII holds the exclusive U.S. rights to patented technology originally developed at the Lebedev Physics Institute and licensed through ZAO.  PII believes this proprietary technology incorporated into the Radiance 330® positions PII to significantly lower the capital and operating costs of proton centers and accelerates the adoption of this important treatment tool in the fight against cancer.

9.      PILLC conducts no business operations and has no employees.  Its sole assets are the ZAO Agreement and the Amended and Restated Rights Agreement.  All business operations are conducted in and through the Company.

## C.      Intellectual Property

10.      As of April 30, 2015, the Company had filed in Professor V.E. Balakin's name 45 U.S. patent applications, 41 of which have been issued as patents by the U.S. Patent and Trademark Office.  Current patents are interconnected, creating an overlapping "wall" of patent protection for the system.  The Company holds exclusive U.S. rights to the technology.

11.      As of April 30, 2015, the Company has filed in its name two U.S. patent applications, one of which has been issued as a patent by the U.S. Patent and Trademark Office. The Company is in the process of filing an additional patent and expects to file more in the future in its own name.

12.      In addition to patents, the Company relies upon unpatented trade secrets and know-how and continuing technological innovation to develop and maintain its competitive position.  The Company seeks to protect its proprietary information, in part, using confidentiality agreements with its commercial partners, collaborators, employees and consultants and invention assignment agreements with its employees.  The Company also has confidentiality agreements or invention assignment agreements with some of its commercial partners and consultants.

## D.      Purchase Agreements for Radiance 330®

13.      ProTom has entered into three Purchase Agreements related to the sale of its Radiance 330®. The first purchase agreement is the Purchase Agreement dated March 12, 2010 between ProTom and McLaren Health Care Corporation ("***McLaren***"), (the "***McLaren Agreement***") for the sale and installation of the Radiance 330® at McLaren ("***McLaren Project***").  The Radiance 330® installed at McLaren is not yet ready for patient treatment, and

McLaren has advanced to ProTom funds in excess of contract payments called for under the McLaren Agreement. McLaren has sent to ProTom a notice of termination under the McLaren Agreement, but ProTom has informed McLaren that ProTom disputes McLaren's right to terminate.

14.    On February 15, 2012, the Company and Atlantic Health Systems, Inc. ("**AHS**") entered into a Purchase Agreement for Proton Therapy System (the "**AHS Agreement**") related to the sale of the Radiance 330® for installation in a multi-room proton therapy facility to be built by AHS in central New Jersey ("**AHS Project**"). Under the terms of the AHS Agreement, as amended, ASH has made payments to ProTom to date aggregating $5,000,000, but AHS has not yet finalized its order for a Radiance 330® under the terms of the AHS Agreement. The AHS Agreement provides that AHS is not obligated to finalize the order for the Radiance 330® until there have been 30 continuous days of scheduled patient treatment at the McLaren proton therapy facility.

15.    On March 14, 2014, the Company and The General Hospital Corporation d/b/a Massachusetts General Hospital ("**Mass General**") entered into a Purchase Agreement for Radiance 330® (the "**MGH Agreement**") for the sale and installation of the Radiance 330® at a single-room proton therapy center at Mass General ("**MGH Project**"). The installation of the Radiance 330® at Mass General is underway and Mass General and the Company currently anticipate that first patient treatment using the Radiance 330® will commence at Mass General in the first half of 2017.

16.    Under the terms of each of the McLaren Agreement, the AHS Agreement and the MGH Agreement, following the commencement of patient treatment at the proton therapy facilities identified in those agreements, the Company will provide continuing service and

maintenance obligations at each facility pursuant to service and maintenance agreements between the Company and each of McLaren, AHS and Mass General. These service agreements provide for initial terms of up to ten (10) years, with automatic renewal terms (subject to the action of either party to terminate) and for substantial annual service fee payments to the Company.

E.     **FDA Clearance**

17.     In order for the Radiance 330® to be cleared for patient treatment it was required to be cleared as a medical device by the U.S. Food and Drug Administration ("***FDA***"). In March 2014, the Company received FDA 510(k) approval of the Radiance 330®. This approval is of significant value to the Company as it approves the Radiance 330® for patient treatment.

F.     **Assets**

18.     The Debtors' assets consist primarily of (i) its rights under the ZAO Agreement to sell and market the Radiance 330® proton therapy system, (ii) the FDA 510(k) approval of the Radiance 330®; (iii) the patents and intellectual property developed by the Company for the design, assembly and operation of the Radiance 330®, (iv) the McLaren Agreement, AHC Agreement and MGH Agreement, and (v) various personal property and equipment. Substantially all of the assets are pledged to Michaelson Capital Partners, LLC ("***Michaelson***") on a senior secured basis to secure loans made by Michaelson prior to the commencement of these Chapter 11 Cases.

G.     **Events Leading to a Chapter 11 Filing and Additional Background**

19.     As a pioneer in developing the Radiance 330®, there were unforeseen problems, events and vendor failures which resulted in costs and expenses for the McLaren Project greater than the original projected cost in the McLaren Agreement and also delayed the time for completion and first patient treatment. As a result, there was a delay in other contracts and

negative impact on the ability of the Company to raise new equity. There have been significantly fewer problems in the MGH Project as a result of experience from the work performed for the McLaren Project.

20. In March, 2015, the McLaren directors verbally committed to fund an additional $5 to $10 million to ProTom as new equity or debt. ProTom relied on this commitment in continuing its work on the McLaren Project and MGH Project. Instead of following through with this commitment, at the end of March, 2015 (i) the two McLaren directors on ProTom's board, including the Chairman, resigned from the board, and (ii) McLaren served written notice on ProTom that it was exercising its right to terminate the McLaren Agreement and refused to fund the additional $5 to $10 million. ProTom disputed the attempted termination by McLaren.

21. As a result of all of the foregoing, ProTom failed to meet certain financial covenants under the Michaelson Loan Documents and Michaelson declared a default on April 1, 2015. As a result of such declaration, Michaelson initiated actions resulting in the sweeping of the Company's depository account at Regions Bank causing the transfer of approximately $4.6 million from the Company's depository account to an account under Michaelson's control on or about April 13, 2015. Michaelson has subsequently provided limited funding to the Company for certain operating expenses and payroll. In addition, Michaelson has agreed to provide DIP financing to the Company to enable the Company to conduct, and continue operating until it consummates, a § 363 sale of its assets. The Company believes a sale of its assets provides the best opportunity to realize value for all creditors and equity holders and provide for the completion of the McLaren Project, MGH Project and AHS Project.

**H.     Sale of Assets**

22. KeyBanc Capital Marketing Inc. ("***KeyBanc***") has been assisting the Debtors in marketing its assets for sale or recapitalization.

23.     The Debtors believe that the best way to maximize the value of its estate for the benefit of its creditors is to preserve the going concern value of the Debtors' business through a sale of substantially all of the Debtors' assets.  The Debtors' tenuous liquidity position dictates that the Debtors seek a sale of substantially all of their assets at the current time.  The Debtors do not have the liquidity to finance a lengthy chapter 11 case.  Accordingly, the Debtors are seeking approval of bid procedures and a sale to the highest bidder at the current time in order to avert any liquidity crisis.

24.     The Debtors have prepared a form of Asset Purchase Agreement to be used in the purchase of Debtors' assets in the sale process.

## II.
## RELIEF REQUESTED

25.     Due to the liquidity issues described above, the Debtors have filed this Motion and are requesting an expedited hearing seeking approval of the procedures described herein for the sale of substantially all of the assets of PII and PILLC (the "***Sale Procedures Hearing***").

26.     KeyBanc has been assisting the Debtors in marketing its assets for sale.  The Debtors believe that the best way to maximize the value of its estate for the benefit of creditors is to preserve the going concern value of PII and to conduct a sale of substantially all the Debtors' assets to the third party submitting the highest bid.  The Debtors have prepared a form of Asset Purchase Agreement to be used for the purchase of substantially all of the Debtors' assets through payment in cash (the "***Purchase Agreement***"); a copy of the Purchase Agreement is attached hereto as ***Exhibit A***.

27.     By this Motion, the Debtors seek approval of the procedures for the sale (the "Sale") of substantially all of its assets (the "***Assets***"), pursuant to the terms of the Purchase Agreement to the highest bidder (the "***Buyer***") free and clear of liens, claims and encumbrances.

28.    At the Sale Procedures Hearing, the Debtor will seek to implement a formal auction and bidding process for the Assets (the "*Auction*") pursuant to the Bidding Procedures attached hereto as ***Exhibit B***.

29.    As described more fully below, the Debtor will provide notice of the Auction and Sale (the "*Sale Notice*") to any parties who have previously expressed an interest in the Assets or who may be interested in purchasing the Assets.

30.    The Debtors request that the Court set July 10, 2015, at 5:00 p.m. prevailing central time, as the deadline (the "***Bid Deadline***") by which a bid for the Assets must be submitted in writing to the Bid Notice Parties referenced in paragraph 28 below.

31.    Additionally, the Debtors request that July 14, 2015, be set as the date for the Auction (the "***Auction Date***"") with such Auction to occur at the offices of Debtors' counsel, Jackson Walker L.L.P., 901 Main Street, Suite 6000, Dallas, Texas 75202, beginning at 10:00 a.m. (prevailing central time) and a hearing to approve a sale (the "***Sale Hearing***") pursuant to such Auction not more than three (3) business days following the Auction Date. A proposed order approving the terms of the Sale is attached hereto as ***Exhibit D***.

## I.    THE BIDDING PROCEDURES

32.    The Bid Procedures are as set forth on ***Exhibit B***.  Generally, the Debtors shall be represented by James T. Lilly of KeyBanc Capital Markets, Inc. and the Debtor's CEO, Stephen L. Spotts (collectively the "***Debtor Auction Team***") for all purposes in evaluating bids and in making decisions in the course of the auction process. The Debtor Auction Team, in consultation with the Official Committee of Unsecured Creditors ("*UCC*"), if appointed, will consider bids from interested parties pursuant to the Auction process, provided that any such bid is: (i) received by the Auction Bid Deadline; (ii) delivered in writing to the Bid Notice Parties referenced in paragraph 28 below, (iii) is accompanied by an executed copy of a Purchase

Agreement, (iv) indicates the amount of cash and other consideration the party is willing to pay for the Assets; (v) includes written evidence of available cash or a commitment for financing and such other evidence of ability to consummate the transaction as the Debtor Auction Team (in consultation with the UCC) may request; (vi) describes the Assets to be purchased; (vii) includes a copy of a board resolution or similar document demonstrating the authority of the bidding party to make a binding and irrevocable bid on the terms proposed; (viii) is not conditional on the outcome of any unperformed due diligence, the receipt of equity or debt financing, or the approval of any Board of Directors, shareholder, or other corporate approval; (ix) includes any pertinent factual information regarding the proposed bidder's operations that would assist the Debtor Auction Team's analysis of issues (if any) arising with respect to any regulatory or statutory issues; (x) includes evidence regarding ability to adequately perform the terms of any Executory Contract (as defined below) sought to be assumed or assigned; (xi) is reasonably likely to close no later than July 28, 2015; and (xii) includes a deposit as described in the Bid Procedures (collectively and as described in more detail in the Bid Procedures, a "***Qualified Bid***"). Michaelson shall have the right, but not the obligation, pursuant to § 363(k) of the Bankruptcy Code to credit bid up to the full amount of its secured claim.

33. Bids must be delivered in writing by the Bid Deadline to (a) the Debtors' counsel, Jackson Walker L.L.P., 901 Main Street, Suite 6000, Dallas, Texas 75202 (Attn: Kenneth Stohner, Jr., kstohner@jw.com); (b) the counsel to Michaelson, Reed Smith, 599 Lexington Avenue, New York, New York 10022 (Attn: Michael J. Venditto, mvenditto@reedsmith.com); and (c) counsel for the Official Committee of Unsecured Creditors, ] (Attn: [insert attorney and email address]) (collectively, the "Interest Notice Parties") in order to be considered.

34.     Any overbids shall be made in overbid increments of at least $1,000,000 greater than the Best Qualified Bid.

35.     Furthermore, in connection with the Sale and as described in the Purchase Agreement, the Debtor will also seek to assume and assign certain of the Debtor's executory contracts and unexpired leases (collectively, the "***Executory Contracts***") to Buyer. The Buyer will cure all monetary defaults under such Executory Contracts to the extent required by Section 365(b) of the Bankruptcy Code and as set forth in the Purchase Agreement.

### III.
### THE SALE

36.     The Debtor proposes to sell the Assets, in accordance with section 363(b) of the Bankruptcy Code, free and clear of all liens, claims and encumbrances.  Subject to the limitations set forth in the Purchase Agreement, and as set forth below, the Assets are generally comprised of all of the Seller's right, title and interests in and to all of the properties and assets of every kind and description of the Seller, whether real, personal, mixed, tangible or intangible, and wherever located including the following (as more fully described and as referenced in the Asset Purchase Agreement):

        a.     All tangible personal property of the Business, wherever located, including, but not limited to, all machinery, equipment, tools, fixtures, parts, supplies, furniture, furnishings, motor vehicles, Inventory and computers, including the tangible personal property which is listed on Schedule 2.1(a);

        b.     All Leased Real Property which is listed on Schedule 2.1(b);

        c.     The Transferred Intellectual Property Rights;

d. All of the customer Contracts listed on <u>Schedule 2.1(d)</u> and all rights of any kind relating thereto including rights to payments thereunder (the "<u>Customer Contracts</u>");

e. All of the vendor Contracts listed on <u>Schedule 2.1(e)</u> and all rights of any kind relating thereto (the "<u>Vendor Contracts</u>");

f. All Contracts listed on <u>Schedule 2.1(f)</u> and all rights of any kind relating thereto (the "***Other Contracts***");

g. All Permits listed on <u>Schedule 2.1(g)</u>, but only to the extent such Permits may be transferred under applicable Law;

h. All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

i. All prepaid expenses, credits, advance payments, security, deposits, charges, sums and to the extent related to any Purchased Assets;

j. Originals, or where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that relate to the Business or the Purchased Assets, other than books and records set forth in Section 2.2(e); and

k.      All goodwill associated with any of the assets described in the foregoing clauses.

37.     Pursuant to the Purchase Agreement, the following, among other things, would be excluded from the Assets (as more fully described and as referenced in the Asset Purchase Agreement):

a.      All cash, bank deposits, bank accounts, certificates of deposit, pre-paid amounts with third parties, vendor deposits, customer deposits, performance bonds and/or cash equivalents (including marketable securities and short term investments);

b.      All rights of Sellers under this Agreement or the Retained Contracts;

c.      All insurance policies of each Seller and all rights thereunder (including, without limitation, any and all insurance refunds or claims made under such policies relating to the Purchased Assets on or before the Closing Date);

d.       All Tax assets and attributes and all claims which any Seller, an Affiliate of any Seller, or the Business may have, on or after the date hereof, against any Governmental Authority for refund or credit of any type with respect to Taxes applicable to the Business for periods ending on or prior to the Sale Date, including, without limitation, any Tax refund due to Sellers with respect to periods ending prior to the Sale Date;

e.      The organizational documents, minute books, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, personnel records, stock records and Tax Returns of Sellers and other similar books and records, financial records, books of account, bank and brokerage records and statements and any other books and

records which Sellers are prohibited from disclosing or transferring to Buyer under applicable Law or is required by applicable Law to retain;

f.    All rights to any action, suit or claim of any nature available to or being pursued by Sellers, whether arising by way of counterclaim or otherwise, including but not limited to (i) claims for breach of contract, or breach of fiduciary duty or tort claims and (ii) all Sellers' claims or causes of action, including those vested in any Seller under Sections 541, 542, 544, 545, 547, 548 and 549 (and, to the extent applicable for remedies, Sections 550 and 551) of the Bankruptcy Code; and

g.    The assets, properties and rights specifically set forth on <u>Schedule 2.2(f)</u>.

38.    The Debtors will not make any representation or warranty as to the Assets to be sold, or their suitability for any particular purpose or merchantability, except as set forth in the Purchase Agreement.

39.    The obligations of the Buyer under the Purchase Agreement to consummate the transactions contemplated therein at the Closing are subject to the satisfaction of the conditions precedent set forth in the Purchase Agreement.

40.    Without any further order of the Bankruptcy Court, if for any reason the Successful Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtor's Auction Team, in their sole discretion after consultation with the UCC, the Backup Bidder will be deemed to have submitted the highest or best bid and the Debtors and the Debtors are authorized to effect the Sale to the Backup Bidder as soon as is commercially reasonable.

41.    Following the Sale, (i) if such failure to consummate the Sale is the result of a breach by the Successful Bidder or the Backup Bidder, the Successful Bidder or the Backup Bidder, as the case may be, shall be deemed to have forfeited its deposit and the Debtor

additionally reserves the right to seek all available damages from any defaulting Bidder, and (ii) if such failure to consummate the Sale is the result of a breach by the Debtor, the Successful Bidder or Backup Bidder, as the case may be, shall have no recourse against the Debtor other than for recovery of its deposit.

## IV.
## ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

42.     As part of the Sale, the Debtors will seek authority to assume and assign to the Buyer certain Executory Contracts, as designated by the Buyer and which the Debtor may assume and assign under applicable law. The proposed form of such assignment will be set forth in the Purchase Agreement.

43.     Not less than twenty (20) days before the Sale Hearing, the Debtor will file with the Court and serve on each party to an Executory Contract a notice setting forth the amount of cure owed thereunder according to the Debtor's books and records (the "*Cure Notice*"). The Cure Notice will state the amount that the Debtors believe is necessary to assume such contract or lease pursuant to section 365 of the Bankruptcy Code (the "*Cure Amount*"), and notify each party that such party's lease or contract may be assumed and assigned to the Buyer.

44.     The Cure Notice will require that any objection to the Cure Amount be filed on or before the date that is five (5) days before the Sale Hearing (the "*Cure Objection Deadline*"). The Cure Notice will also provide that any objection to the Cure Amount must state with specificity what cure the party to the Executory Contract believes is required with appropriate documentation in support thereof. The Debtors request that, if an objection is timely filed, the Court resolve any dispute regarding the amount of any disputed Cure Amount or objection to the assumption and assignment of an Executory Contract at the Sale Hearing. If no objection is timely received, the Debtors request that the Cure Amount set forth in the Cure Notice be

controlling notwithstanding anything to the contrary in any assumed contract or other document as of the date of the Cure Notice.

## V.
## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**A.      The Sale**

45.      Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(r).   Section 363(b), does not provide an express standard for determining whether the Court should approve any particular purchase or sale.

46.      The Fifth Circuit has however set forth the standard for authorization of a sale, acknowledging that each hearing on a Section 363(b) transaction "cannot become a mini-hearing on plan confirmation." *In re Continental Air Lines, Inc.,* 780 F.2d 1223, 1227 (5th Cir. 1986). Specifically, according to the Fifth Circuit:

> We also agree with the Second Circuit that implicit in section 363(b) is the further requirement of justifying the proposed transaction. *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983). That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business...whether the proffered business justification is sufficient depends on the case.

*Id.* at 1226.

47.      Thus where the proposed sale is merely a transfer of assets for value not effectively short circuiting the requirements of Chapter 11, and the Debtors' decision represents a reasonable business judgment, the court should authorize the transaction. *See id; In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir. 1983). Indeed, court approval of a proposed transaction "should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or

contrary to the provisions of the Bankruptcy Code. . . ." *Richmond Leasing Co.* v. *Capital Bank, N.A.,* 762 F.2d 1303, 1309 (5th Cir. 1985) *(quoting Allied Technology, Inc. v. R.B. Brunemann & Sons, 25* Bankr. 484, 495 (Bankr. S.D. Ohio 1982)). Requiring a debtor to justify its actions beyond the "business judgment" standard if creditors object "would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control in case impartially. Id. at 1311 (*citing In re Airlift International, Inc.,* 18 Bankr. 787, 789 (Bankr. S.D.Fla. 1982); *In re Curlew Valley Assocs.,* 14 Bankr. 506, 509-514 (Bankr. D. Utah 1981)); see *also In re Condere Corp.,* 228 B.R. 615 (Bankr. S.D. Miss. 1998) (granting debtor's motion to sell assets under section 363 where the court found the debtor met the requisite business justification for the sale, including a lack of any offer to purchase the debtor in prior prepetition attempts to sell the company). Thus, the Court should grant the relief requested in this Motion because the Debtors demonstrate a sound business justification therefor.

48.     The Debtors have a sound business justifications for selling the Assets at this time pursuant to the Sale Procedures outlined above. The Debtors do not have the financial resources or access to capital necessary to continue its business and implement a prolonged restructuring or sale process. The Sale Procedures outlined above are necessary as they represent the only viable option likely to maximize value for stakeholders and avoid conversion to a case under chapter 7 of the Bankruptcy Code or a dismissal of the chapter 11 case and subsequent foreclosure proceeding, both of which would result in less value for all parties in interest. The Debtor has therefore determined, based upon its sound business judgment, that the most viable option for maximizing the value of its estate is through a sale of substantially all of its assets based upon the Sale Procedures.

**B.     The Assumption and Assignment of the Executory Contracts Should be Authorized**

49.     Section 365(f)(2) of the Bankruptcy Code provides that:

> [t]he trustee may assign an executory contract or unexpired lease of the debtor only if-
>
> (A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

50.     Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A)   cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)  provides adequate assurance of future performance under such contract or lease.

51.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *See, e.g., EBG Midtown South Corp. v. McLaren/Hart Em. Engineering Corp. (In re Sanshoe Worldwide Corp.),* 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Prime Motor Inns Inc.,* 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[although no single solution will satisfy every case, the

required assurance will fall considerably short of an absolute guarantee of performance"); *Carlisle Homes, Inc.* v. *Azzari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

52. Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

53. To the extent that any defaults exist under any of the Executory Contracts to be assumed and assigned in connection with the Sale, the Buyer shall cure any such default in connection with such assumption and assignment subject to the terms and conditions of the Purchase Agreement. Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Buyer, and its willingness and ability to perform under the Executory Contracts to be assumed and assigned.

54. The Sale Hearing will therefore provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Buyer to provide adequate assurance of future performance under the Executory Contracts to be assumed and assigned.

**C.    Form and Manner of Notice**

55. The Debtors will provide the Sale Notice to any parties who have previously expressed an interest in the Assets or who may be interested in purchasing the Assets and all creditors of the Debtors and all contract parties, in accordance with Bankruptcy Rule 2002(a)(2),

by mailing such notice more than twenty (20) days prior to the date set by this Court for the Sale Hearing.

56.     The Debtors submit that the form and manner of service of the Sale Notice is appropriate under the circumstances and complies with all applicable Bankruptcy Rules.

**WHEREFORE,** the Debtors respectfully request the Court enter an order: (a) approving the Sale Procedures, (b) setting a date for the Sale Hearing, and (c) approving the Sale Notice and (d) granting such other and further relief as is necessary.

Dated:  May 12, 2015

Respectfully submitted,

By:   */s/ Kenneth Stohner, Jr.*
      Kenneth Stohner, Jr.
      State Bar No. 19263700
      kstohner@jw.com
JACKSON WALKER L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 953-6000
(214) 661-6803 – Fax

**PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS-IN-POSSESSION
PROTOM INTERNATIONAL, INC. AND
PROTOM INTERNATIONAL, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of May, 2015, a true and correct copy of the foregoing was served via the Court's CM/ECF electronic notification system on all parties requesting same, and via facsimile, email and/or US first class mail, postage prepaid to the parties listed on the attached service list.

*/s/ Kenneth Stohner, Jr.*
      Kenneth Stohner, Jr.

## SERVICE LIST

**Debtor(s)**
ProTom International, LLC
1100 Parker Square, Suite 230
Flower Mound, TX 75028-7459

ProTom International, Inc.
1100 Parker Square, Suite 230
Flower Mound, TX 75028-7459

**United States Trustee**
Office of the United States Trustee
Earle Cabell Federal Building
1100 Commerce Street, Room 976
Dallas, TX 75242
Fax: 214/ 767-8971

**Secured Lender**
Michaelson Capital Special
Finance Fund, LP
ATTN:  V. Capone
400 Madison Ave., Suite 2A
New York, NY 10017
vcapone@michaelsoncapital.com

**20 Largest Unsecured Claims**

401 Edgewater LLC
P.O. Box 19479
Johnston, RI 02919
keri.brewer@hobbsbrook.com

Accelerated, LLC
605 Fulton Ave.
Rockford, IL 61103-4183
sue.cunningham@accmach.com

AccSys Technology, Inc.
ATTN:  Accounts Payable
1177 Quarry Lane
Pleasanton, CA 94566
hseki@accsys.com

Anixter, Inc.
P.O. Box 847428
Dallas, TX 75284-7428
ryan.sullivan@anixter.com

Applied Power Quality Solutions, LLC
P.O. Box 14915
Scottsdale, AZ 85267-4915
edweiss@appliedpqs.com

ASTRO
P. O. Box 417217
Boston, MA 02241-7217
exhibitfinance@jspargo.com

Blue Cross & Blue Shield of Alabama
P.O. Box 360037
Birmingham, AL 35236-0037
Fax (205)220-9089

Buckley Systems
6 Bowden Rd
Mt Wellington Auckland 01060 New
Zealand
bill.dodge@buckleysystems.com

ClearCube Technology, Inc.
P.O. Box 842223
Dallas, TX 75284-2223
finance@clearcube.com

East Coast Metrology, LLC
428A Boston Street
Topsfield, MA 01983
ray.ryan@eastcoastmetrology.com

Elavon
2 Concourse Parkway
Suite 800
Atlanta, GA 30328
john.urbach@elavon.com

Forte Automation Systems, Inc.
8155 Burden Road
Machesney Park, IL 61115
toby@forteautomation.com

Internal Revenue Service
P.O. Box 219690
Kansas City, MO 64121-9690
Fax: 267/941-1015

Jay Flanz, Ph. D.
75 Crossbow Lane
North Andover, MA 01845
nflan1@aol.com

LAURUS Systems, Inc.
3460 Ellicott Center Dr.
Suite 101
Ellicott City, MD 21043-4164
andrea@laurussystems.com

Massachusetts Institute of Technology
Cashier's Office NE49-3007
77 Massachusetts Avenue
Cambridge, MA 02139
jkelsey@mit.edu

McLaren Healthcare
G-3235 Beecher Road Suite B
Flint, MI 48532-3615
greg.lane@mclaren.org

Parker Hannifin Corp, Filt & Sep. Div.
7975 Collection Center Dr.
Chicago, IL 60693
ipanzini@parker.com

Pyramid Technical Consultants, Inc.
1050 Waltham St., Suite 200
Lexington, MA 02421
wnett@ptcusa.com

Stak Design
1540 Luna Road
Carrollton, TX 75006
hhankamer@stakdesign.com

13378562v.2