# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is dated as of [_____], 2015 by and among [_____], a [_____] ("Buyer"), ProTom International, LLC, a Texas limited liability company ("PIL"), and ProTom International, Inc., a Delaware corporation ("PII" and, together with PIL, "Sellers"). Buyer and Sellers are also referred to herein individually as a "Party," and, collectively, as the "Parties."

## RECITALS:

A. PIL and PII are debtors-in-possession in jointly administered Chapter 11 reorganization cases, Case No. [_____] (the "Chapter 11 Case") pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

B. Sellers are engaged in the development, production, sale and marketing of the Radiance 330 Proton Therapy System for patient treatment (the "Business").

C. Sellers desire to sell, transfer, convey, assign and deliver to Buyer, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets, together with the Assumed Liabilities, upon the terms and subject to the conditions set forth in this Agreement.

D. The Purchased Assets will be sold pursuant to the Sale Order, which shall, *interalia*, incorporate the terms of this Agreement.

E. Subject to the Bankruptcy Court's entry of the Sale Order, Buyer will purchase from the Sellers, and the Sellers will sell, transfer, convey, assign and deliver to the Buyer, all of the Purchased Assets together with the Assumed Liabilities, upon the terms and subject to the conditions set forth in this Agreement.

F. The Parties have agreed on the terms and conditions of a sale and assignment of the Purchased Assets to Buyer and the assumption of the Assumed Liabilities by Buyer on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and of their mutual covenants and agreements set forth in this Agreement, the Parties do hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

1.1    Definitions.

When used in this Agreement, the following terms in all of their tenses shall have the meanings assigned to them below or elsewhere in this Agreement as indicated below:

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Agreement" is defined in the Preamble.

"Allocation" is defined in Section 4.3.

"Assignment and Assumption Agreement" means an Assignment and Assumption Agreement executed by Buyer and Sellers, in a form reasonably acceptable to Buyer and Sellers.

"Assumed Contracts" means, collectively, the Customer Contracts, the Vendor Contracts and the Other Contracts.

"Assumed Liabilities" is defined in Section 3.1.

"Balakin Agreements" means (a) that certain Amended Agreement, dated April 22, 2008, by and between PIL, ZAO PROTOM and Professor V.E. Balakin, as amended October 16, 2008, March 26, 2009, March 21, 2012, December 30, 2013, and July 1, 2014, and (b) that certain Agreement and Amendment, dated March 12, 2010, by and among Sellers, ZAO ProTom, a closed joint-stock company established under the laws of the Russian Federation, Professor V.E. Balakin, and McLaren Health Care Corporation.

"Balakin Patents" means those U.S. patents set forth on Schedule 1.1(b).

"Balakin Rights" means any and all Intellectual Property Rights in the Balakin Patents granted to Sellers under the Balakin Agreements. For the avoidance of doubt, the Balakin Rights do not include any rights in the Balakin Patents except as expressly set forth in the Balakin Agreements.

"Bankruptcy Code" means Title 11 of the United States Code, as amended, 11 U.S.C. §§ 101, *et. seq.*

"Bankruptcy Court" is defined in the Recitals and includes such other courts exercising competent jurisdiction over the Chapter 11 Case involving Sellers.

"Bill of Sale" means a Bill of Sale executed by each Seller, in a form reasonably acceptable to Buyer and Sellers.

"Business" is defined in the  Recitals.

"Buyer" is defined in the Preamble.

"Cash Deposit" is defined in Section 4.2(a).

"Chapter 11 Case" is defined in the Recitals.

"Closing" and "Closing Date" are defined in Section 9.1.

"Closing Date Payment" is defined in Section 4.2(b).

"COBRA" means the continuation coverage provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as codified in Code Section 4980B and ERISA Sections 601 et seq., as amended from time to time, or other similar provisions of state law.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contemplated Transactions" means all of the transactions contemplated by this Agreement.

"Contract" means any written commitment, understanding, instrument, lease, pledge, mortgage, indenture, license, agreement, purchase or sale order, contract, promise or similar arrangement evidencing or creating any legally binding obligation.

"Customer Contracts" is defined in Section 2.1(d).

"Filing Date" means the date the Chapter 11 Case was filed with the Bankruptcy Court.

"Governmental Approvals" means any approval, consent, permit, license, waiver, or other authorization issued, granted, given or otherwise made available by or under any Governmental Authority or pursuant to any Law.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Intellectual Property" means any (a) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable; (c) trade secrets and confidential know-how; (d) patents and patent applications; (e) websites and internet domain name registrations; and (f) all other intellectual and industrial property rights and assets, and all rights, interests and protections that are associated with any of the foregoing.

"Intellectual Property Rights" means all rights of Sellers in and to any Intellectual Property, including any licenses in, or otherwise related to, any Intellectual Property owned by third parties.

3

"Inventory" means inventories of the Business, wherever located, including raw materials, work-in-process and finished products, saleable inventory, supplies, purchased parts, spare parts and shipping containers and packaging materials.

"Law" means any statute, law, ordinance, regulation, rule, code, Order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Leased Real Property" all material real property leased by Seller and used in connection with the Business.

"Lien" means any lien, charge, covenant, condition, easement, adverse claim, demand, encumbrance, limitation, security interest, option, pledge, or any other title defect.

"Order" shall mean any order, judgment, injunction, award, decree or writ of any Governmental Authority.

"Other Contracts" is defined in Section 2.1(f).

"Party" and "Parties" are defined in the Preamble.

"Periodic Taxes" is defined in Section 10.4.

"Permits" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities.

"Permitted Liens" means (a) Liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property; (c) Liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business; and (d) other imperfections of title or Liens, if any, that have not had, and would not have, a material adverse effect on Sellers or the Business.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Proration Periods" is defined in Section 10.4.

"Purchase Price" is defined in Section 4.1.

"Purchased Assets" is defined in Section 2.1.

"Retained Assets" is defined in Section 2.2.

"Retained Contracts" means all Contracts to which either Seller is a party and which are not Assumed Contracts.

"Sale Date" means the date that the Sale Order is entered by the Bankruptcy Court.

"Sale Order" means the final, non-appealable order of the Bankruptcy Court, to be issued by the Bankruptcy Court pursuant to sections 363, 365 and, to the extent possible, section 1146(c), of the Bankruptcy Code in a form substantially (i) approving this Agreement and the Contemplated Transactions, (ii) approving the sale of the Purchased Assets to Buyer free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to Buyer of any Assumed Contracts and (iv) finding that Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

"Sellers" is defined in the Preamble.

"Tax" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Returns" means any return, report or declaration filed with or submitted to any Governmental Authority in connection with the assessment, collection or payment of any Tax.

"Termination Date" is defined in Section 9.2(b)(ii).

"Transaction Taxes" is defined in Section 10.2.

"Transferred Employees" is defined in Section 8.5(a).

"Transferred Intellectual Property Rights" means all Intellectual Property Rights owned by any Seller and used in the operation of the Business, including the Balakin Rights and those listed on Schedule 1.1(a).

"Vendor Contracts" is defined in Section 2.1(e).

1.2     Interpretation.   When a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference shall be to a Section, Schedule or Exhibit of this Agreement unless otherwise indicated.  Whenever the words "included," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation." Unless otherwise indicated, all references to dollars refer to United States dollars.  The Parties acknowledge that both Parties have participated in the drafting and preparation of this Agreement and agree that any rule of construction to the effect that ambiguities are to be construed against the drafting party shall not be applied to the construction or interpretation of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1    Purchased Assets.   Subject to the terms and conditions of this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, effective as of the Closing, Sellers shall sell, convey, transfer, assign and deliver to Buyer, free and clear of all Liens except the Permitted Liens, and Buyer shall purchase, all right, title and interest in and to the following assets of Sellers (collectively, the "Purchased Assets"):

(a)    All tangible personal property of the Business, wherever located, including, but not limited to, all machinery, equipment, tools, fixtures, parts, supplies, furniture, furnishings, motor vehicles, Inventory and computers, including the tangible personal property which is listed on Schedule 2.1(a);

(b)    All Leased Real Property which is listed on Schedule 2.1(b);

(c)    The Transferred Intellectual Property Rights;

(d)    All of the customer Contracts listed on Schedule 2.1(d) and all rights of any kind relating thereto including rights to payments thereunder (the "Customer Contracts");

(e)    All of the vendor Contracts listed on Schedule 2.1(e) and all rights of any kind relating thereto (the "Vendor Contracts");

(f)    All Contracts listed on Schedule 2.1(f) and all rights of any kind relating thereto (the "Other Contracts");

(g)    All Permits listed on Schedule 2.1(g), but only to the extent such Permits may be transferred under applicable Law;

(h)    All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(i)    All prepaid expenses, credits, advance payments, security, deposits, charges, sums and to the extent related to any Purchased Assets;

(j)    Originals, or where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that relate to the Business or the Purchased Assets, other than books and records set forth in Section 2.2(e); and

(k)    All goodwill associated with any of the assets described in the foregoing clauses.

6

2.2     Retained Assets.  Notwithstanding anything to the contrary in this Agreement, Sellers shall not sell, convey, transfer, assign or deliver, and Buyer shall not purchase or acquire any assets of Sellers other than the Purchased Assets.  Without limiting the generality of the foregoing, the Buyer shall not acquire any of the following assets (collectively, the "Retained Assets"):

(a)     All cash, bank deposits, bank accounts, certificates of deposit, pre-paid amounts with third parties, vendor deposits, customer deposits, performance bonds and/or cash equivalents (including marketable securities and short term investments);

(b)     All rights of Sellers under this Agreement or the Retained Contracts;

(c)     All insurance policies of each Seller and all rights thereunder (including, without limitation, any and all insurance refunds or claims made under such policies relating to the Purchased Assets on or before the Closing Date);

(d)     All Tax assets and attributes and all claims which any Seller, an Affiliate of any Seller, or the Business may have, on or after the date hereof, against any Governmental Authority for refund or credit of any type with respect to Taxes applicable to the Business for periods ending on or prior to the Sale Date, including, without limitation, any Tax refund due to Sellers with respect to periods ending prior to the Sale Date;

(e)     The organizational documents, minute books, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, personnel records, stock records and Tax Returns of Sellers and other similar books and records, financial records, books of account, bank and brokerage records and statements and any other books and records which Sellers are prohibited from disclosing or transferring to Buyer under applicable Law or is required by applicable Law to retain;

(f)     All rights to any action, suit or claim of any nature available to or being pursued by Sellers, whether arising by way of counterclaim or otherwise, including but not limited to (i) claims for breach of contract, or breach of fiduciary duty or tort claims and (ii) all Sellers' claims or causes of action, including those vested in any Seller under Sections 541, 542, 544, 545, 547, 548 and 549 (and, to the extent applicable for remedies, Sections 550 and 551) of the Bankruptcy Code; and

(g)     The assets, properties and rights specifically set forth on Schedule 2.2(f).

2.3     Deemed Consents and Cures.  For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required consents, as applicable, in respect of the assignment of any Purchased Asset and to have cured all defaults thereunder if, and to the extent that, pursuant to the Sale Order Sellers are authorized to assign any Purchased Assets to Buyer pursuant to section 365 of the Bankruptcy Code.

**ARTICLE III**
**ASSUMPTION OF LIABILITIES**

3.1     Assumed Liabilities.    Upon the terms and subject to the conditions of this Agreement, Buyer shall assume, pay, perform and discharge when due, effective as of the Sale Date, only the following liabilities, responsibilities and obligations of Sellers existing as of the Sale Date (collectively, the "Assumed Liabilities"):

(a)     All of Sellers' liabilities, responsibilities and obligations under the Assumed Contracts;

(b)     All liabilities of Sellers accruing on or after the Filing Date;

(c)     All claims, liabilities, responsibilities, obligations, costs and expenses arising in any way out of the operation of the Business or the ownership or operation of the Purchased Assets on or after the Sale Date, including, without limitation, (i) any and all Taxes arising out of or attributable to the operation or ownership of the Purchased Assets on or after the Sale Date, (ii) any and all claims associated with the use of any Purchased Assets, including liability to any third party for any injury or damage to persons or property and any damage to the asset itself, due to any condition of, defect in, or design of the asset in question, latent or otherwise, whether such condition, defect, or design now exists or hereafter occurs and (iii) any and all warranty obligations or claims relating to warranties provided to customers of the Business on or prior to the Sale Date; and

(d)     All liabilities associated with the Transferred Employees accruing after the Closing, including with respect to employee benefits, compensation or other arrangements with respect to any Transferred Employee.

3.2     Excluded Liabilities.    Each Seller shall retain and shall pay, perform and discharge when due, all liabilities, responsibilities and obligations of Sellers not specifically included in the Assumed Liabilities.

**ARTICLE IV**
**CONSIDERATION**

4.1     Purchase Price.    The total consideration to be paid by Buyer to Sellers for the Purchased Assets is (i) the payment to Sellers in cash in an amount equal to $[_____] (the "Purchase Price") and (ii) the assumption by Buyer of the Assumed Liabilities.  The Purchase Price shall be allocated between Sellers as determined by the Bankruptcy Court.

4.2     Payment.  Buyer shall pay the Purchase Price to Sellers as follows:

(a)     The cash deposit in the amount of $[_____] (the "Cash Deposit") is to be held by Sellers against payment of the Purchase Price and as security for the performance by Buyer of its obligations under this Agreement.

(b)    An amount equal to the Purchase Price less the Cash Deposit (the "Closing Date Payment") will be paid at the Closing by wire transfer of immediately available funds to the accounts designated by Sellers.

4.3    Allocation of Purchase Price.  Prior to or on the Closing Date, the Parties shall agree to the allocation of the appropriate portions of the Purchase Price, Assumed Liabilities and other relevant items among the Purchased Assets, including goodwill and other assets, in accordance with Code Section 1060 and any comparable provisions of state or local Law, as appropriate (the "Allocation"), which Allocation shall be binding upon the Parties and which will be attached to this Agreement as Schedule 4.3.  The Parties and their respective Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such Allocation.  Each Party shall furnish the other Party with such cooperation and existing information as is reasonably requested by the other Party in connection with the preparation of the Allocation described in this Section 4.3.  The Parties covenant and agree that (i) neither Buyer nor Sellers shall assert that this Section 4.3 was not separately bargained for at arm's length and in good faith, and (ii) neither Buyer nor Sellers will take any position before any Governmental Authority, in any judicial proceeding, or in any Tax Return that is in any way inconsistent with such Allocation unless otherwise required by Law.

4.4    Risk of Loss.  Notwithstanding anything to the contrary herein, Buyer shall assume all risk of loss with respect to the Purchased Assets and shall become fully obligated with respect to the Assumed Liabilities on and as of the Sale Date.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Each Seller, severally and not jointly, hereby represents and warrants to Buyer as follows:

5.1    Organization and Power of Sellers.  PII is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  PIL is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas.  Each Seller has full corporate or company power, as applicable, to:  (a) own, lease and operate the Purchased Assets and carry on the Business as and where such assets are now owned or leased and as the Business is presently being conducted; and (b) execute, deliver and perform this Agreement and all other agreements and documents to be executed and delivered by such Seller in connection herewith, subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.

5.2    Enforceability.  All requisite action to approve, execute, deliver and perform this Agreement has been taken by Sellers.  This Agreement and each other agreement and document delivered by each Seller in connection herewith have been duly executed and delivered by such Seller and constitute the binding obligation of such Seller, enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency,

reorganization, moratorium, and other laws affecting creditors' rights generally and by principles of equity.

5.3    <u>Brokers or Finders</u>.  Except as set forth on <u>Schedule 5.3</u>, no Person is or will become entitled, by reason of any agreement or arrangement entered into or made by or on behalf of Sellers, to receive any commission, brokerage, finder's fee or other similar compensation arrangement in connection with the consummation of the Contemplated Transactions.

5.4    <u>No Implied or Other Representations or Warranties</u>.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT SELLERS AND ANY OF THEIR RESPECTIVE AFFILIATES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO ANY OF THE ASSETS, AND IT IS UNDERSTOOD THAT EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, BUYER TAKES ALL OF SUCH PROPERTIES AND ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.  NEITHER SELLERS NOR ANY STOCKHOLDERS, MEMBERS, EMPLOYEES, DIRECTORS, OFFICERS OR REPRESENTATIVES OF THE SELLERS HAVE MADE, AND SHALL NOT BE DEEMED TO HAVE MADE, ANY REPRESENTATIONS OR WARRANTIES IN ANY PRESENTATION OF THE BUSINESS OF SELLERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREIN, AND NO STATEMENT MADE IN ANY SUCH PRESENTATION SHALL BE DEEMED A REPRESENTATION OR WARRANTY HEREUNDER OR OTHERWISE.  IT IS EXPRESSLY UNDERSTOOD THAT ANY COST ESTIMATES, PROJECTIONS, PREDICTIONS OR FORWARD-LOOKING STATEMENTS CONTAINED IN ANY DATA, FINANCIAL INFORMATION, MEMORANDA OR OFFERING MATERIALS OR PRESENTATIONS ARE NOT AND SHALL NOT BE DEEMED TO BE OR INCLUDE PRESENTATIONS OR WARRANTIES OF SELLERS OR OF ANY STOCKHOLDER, MEMBER, EMPLOYEE, DIRECTOR, OFFICER, OR REPRESENTATIVE OF SELLERS.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as follows:

6.1    <u>Organization and Power</u>.  Buyer is a [_____] duly organized, validly existing and in good standing under the laws of the State of [_____]. Buyer has full power to execute, deliver and perform this Agreement and all other agreements and documents to be executed and delivered by it in connection herewith.

6.2    <u>Enforceability</u>.  All requisite action to approve, execute, deliver and perform this Agreement and each other agreement and document delivered by Buyer in connection herewith has been taken by Buyer.  This Agreement and each other agreement and document delivered by

10

Buyer in connection herewith have been duly executed and delivered by Buyer and constitute the binding obligations of Buyer enforceable in accordance with their respective terms.

6.3 <u>Consents</u>. Except for the approval of the Bankruptcy Court, no approval or consent of, or filing with, any Person or Governmental Authority is required in connection with the transactions contemplated hereby or the execution, delivery or performance by Buyer of this Agreement or any other agreement or document delivered by or on behalf of Buyer in connection herewith.

6.4 <u>No Conflicts</u>. No action taken by or on behalf of Buyer in connection herewith, including, but not limited to, the execution, delivery and performance of this Agreement, and each other agreement and document delivered by it in connection herewith, and consummation of the Contemplated Transactions, (a) gives rise to a right of termination or acceleration under any Contract to which Buyer is a party or by which Buyer is bound; (b) conflicts with or violates (i) any Law; (ii) Buyer's organizational documents; or (iii) any Order to which Buyer is subject; or (c) constitutes an event which, after notice or lapse of time or both, could result in any of the foregoing.

6.5 <u>Litigation</u>. Except for the required approval of the Bankruptcy Court to the consummation of the Contemplated Transactions, no litigation or administrative proceeding is pending, or to the knowledge of Buyer, threatened against Buyer which could prevent Buyer from entering into, or performing its obligations under, this Agreement.

6.6 <u>Brokers or Finders</u>. Except as set forth on <u>Schedule 6.6</u>, no Person is or will become entitled, by reason of any agreement or arrangement entered into or made by or on behalf of Buyer, to receive any commission, brokerage, finder's fee or other similar compensation arrangement in connection with the consummation of the Contemplated Transactions.

6.7 <u>Financing</u>. Buyer has and will have as of the Closing Date adequate cash on hand to enable it to fulfill its obligations under this Agreement. Buyer acknowledges and agrees that Buyer's obligations under this agreement are not contingent on obtaining adequate financing.

6.8 <u>Buyer's Investigation</u>. Buyer represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial advisors and hereby acknowledges that it has conducted an investigation of the Purchased Assets. Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges that it is accepting the Purchased Assets in their present condition and locations and with their present operating capabilities. Buyer acknowledges that Sellers make no warranty, express or implied, as to the condition of the Purchased Assets except as expressly set forth in this Agreement. Buyer has not relied upon, and Sellers shall not be liable for or bound in any manner by, any express or implied verbal or written information, warranties, guarantees, promises, statements, inducements, representations or opinions pertaining to the Business or the Purchased Assets, except as may be contained in this Agreement. Buyer has inspected, or waived its right to inspect, the Purchased Assets for all purposes and satisfied itself as to their condition. Buyer is relying solely upon its own inspection of the Purchased Assets, and Buyer shall accept all of the same in their as is, where is, condition. Buyer acknowledges that the representations and warranties of Sellers contained in this

11

Agreement constitute the sole and exclusive representations and warranties of Sellers to Buyer in connection with this Agreement and the Contemplated Transactions, and Buyer acknowledges that all other representations and warranties are specifically disclaimed and may not be relied upon or serve as a basis for a claim against any Seller.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     Conditions to Obligations of All Parties.  The obligation of each Party to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by each Party:

(a)     The Sale Order shall have been entered by the Bankruptcy Court, and such Sale Order shall be in form and substance reasonably satisfactory to Buyer and Sellers.

(b)     On the Sale Date, there shall be no Order of any nature which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

7.2     Conditions to Buyer's Obligations.  The obligation of Buyer to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by Buyer:

(a)     Each of the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects on and as of the Sale Date with the same effect as though made on the Sale Date.

(b)     Sellers shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Sellers on or prior to the Sale Date.

(c)     Each Seller shall have delivered to, or caused to be delivered to, Buyer the following documents, duly executed by such Seller (where appropriate):

(i)     A duly executed counterpart of the Bill of Sale;

(ii)     A duly executed counterpart of the Assignment and Assumption Agreement;

(iii)     A certificate, dated the Closing Date and signed by an authorized officer of such Seller, certifying (A) that the conditions contained in Sections 7.2(a) and (b) have been satisfied, (B) that attached thereto are true and complete copies of all resolutions adopted by the board of directors or managers, as applicable, of such Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions

contemplated hereby and thereby and (C) the names and signatures of the officers of such Seller authorized to sign this Agreement and the other documents to be delivered hereunder;

        (iv)     A copy of the Sale Order;

        (v)     A payoff letter from the Person listed on <u>Schedule 5.3</u>; and

        (vi)     Such other document(s) or instruments as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

7.3    <u>Conditions to Sellers' Obligations</u>.  The obligation of each Seller to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Sale Date of the following conditions, any one or more of which may be waived by Sellers:

        (a)     Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Sale Date with the same effect as though made on the Sale Date.

        (b)     Buyer shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Sale Date.

        (c)     Buyer shall deliver the Closing Date Payment to Sellers as specified in Article IV.

        (d)     Buyer shall have delivered to, or caused to be delivered, to Sellers the following documents, duly executed by Buyer (where appropriate):

        (i)     All consents, approvals, Permits, licenses and registrations of all Persons and Governmental Authorities necessary for Buyer to execute, deliver and perform this Agreement, including but not limited to consent or approval under any Contracts to which Buyer is a party;

        (ii)     A duly executed counterpart of the Assignment and Assumption Agreement

        (iii)     A certificate, dated the Sale Date and signed by an authorized officer of Buyer, certifying (A) that the conditions contained in Sections 7.3(a) and (b) have been satisfied, (B) that attached thereto are true and complete copies of all resolutions adopted by the [board of directors] of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby and (C) the names and signatures of the officers of Buyer authorized to sign this Agreement and the other documents to be delivered hereunder;

(iv)     The Assignment and Assumption Agreement; and

(v)     Such other document(s) or instruments as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

# ARTICLE VIII
## COVENANTS

8.1     <u>Effectiveness of Representations and Warranties</u>.  Subject to the restrictions set forth in the Bankruptcy Code or Orders of the Bankruptcy Court, from the date hereof through the Sale Date, each Seller shall use reasonable efforts to conduct the Business in such a manner so that the representations and warranties contained in Article V shall continue to be true and correct on and as of the Sale Date as if made on and as of the Sale Date.

8.2     <u>Conduct of Business</u>.  Except to the extent required by the Bankruptcy Court, no Seller shall, with respect to the Business, except as otherwise permitted by the Bankruptcy Code or an Order of the Bankruptcy Court (a) permit any of the Purchased Assets to be subjected to any additional Lien (other than Permitted Liens or mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business); or (b) sell or dispose of any Purchased Assets other in the ordinary course of the operation of the Business.

8.3     <u>Access</u>.  From the date hereof until the Closing Date, Sellers shall provide Buyer and its representatives reasonable access during normal business hours upon reasonable advance notice to Sellers' personnel, facilities and all books and records and such other information and Persons relating to the Business as Buyer may reasonably request in such a manner as not to interfere with the conduct of the Business.  Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to disclose any information to Buyer if such disclosure would, in Seller's sole discretion: (x) cause significant competitive harm to Sellers and the Business, if the transactions contemplated by this Agreement are not consummated; (y) jeopardize any attorney-client or other privilege; or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Prior to the Closing, without the prior written consent of Sellers, which may be withheld for any reason, Buyer shall not contact any suppliers to, or customers of, the Business.

8.4     <u>Bankruptcy Filings</u>.  From the date hereof until the Closing Date, Sellers shall promptly deliver to Buyer's counsel copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers which relate to or may effect this Agreement or the Purchased Assets that Sellers file in the Chapter 11 Case.

8.5     <u>Employee Matters</u>.

(a)     Buyer shall offer employment commencing as of the Sale Date to the employees of the Business that Buyer, in its sole discretion, selects (the "<u>Transferred Employees</u>"), in each case under substantially similar terms and conditions as existing between Sellers and such employees prior to the Closing.  Buyer shall have no obligations, liabilities or

responsibilities with respect to any employees of the Business who do not become Transferred Employees relating to their employment with Seller.

(b)    Buyer shall cause all of its employee benefit and compensation plans (including 401(k), vacation, paid time-off, employee health and other employee financial, welfare or other benefit plans) covering or otherwise benefiting any of the Transferred Employees after the Closing to count service as recognized by Sellers and their Affiliates, without duplication of benefits, for purposes of eligibility to participate, vesting and benefit accrual to the same extent such service was recognized by Sellers.  Buyer shall also cause all waiting periods under each plan that would otherwise be applicable to newly hired employees to be waived with respect to Transferred Employees.

(c)    Buyer shall give Transferred Employees credit, for purposes of Buyer's vacation or other paid leave benefit programs, for their accrued and unpaid vacation or paid leave balance as of the Sale Date.

(d)    Except as otherwise provided herein, Sellers' and their Affiliates' welfare plans shall be responsible for all claims incurred (whether or not reported) prior to the Sale Date, and Buyer's welfare plans shall be responsible for all claims incurred under Buyer's welfare plans on and after the Sale Date.

(e)    Sellers shall (subject to applicable Law) permit Transferred Employees to receive a distribution or make an elective transfer to Buyer's defined contribution plan of their total account balances (including any plan loan to any such employee) under Sellers' defined contribution plan(s), and Buyer shall cause its defined contribution plan established or designated by Buyer, which shall be qualified under Section 401 of the Code, to accept an elective transfer or rollover of such account balances (including any plan loans to any such employees).

(f)    Buyer shall credit toward the applicable deductibles and co-payment limits under its group health plans the same amounts credited under the Sellers' and their Affiliates' group health plans for each Transferred Employee.

(g)    Buyer shall, in accordance with and to the extent permitted by applicable Law, assume all responsibility for preparing and filing Form W-2, Form W-3, Form W-941, Form W-4 and Form W-5 for the Transferred Employees.  Sellers and Buyer shall comply, and cause their respective subsidiaries to comply, with the procedures described in Section 5 of U.S. Revenue Procedure 84-77.  The obligations of Buyer under this Section 8.5(g) shall be Assumed Liabilities.

(h)    Buyer shall offer and provide continuation coverage for all "M&A Qualified Beneficiaries" as that term is defined in section 54.4980B-9 of the COBRA regulations, including without limitation coverage for employees or former employees of Seller who are not Transferred Employees and their respective spouses and dependents, and for former employees of Sellers or their dependents whose COBRA qualifying events occurred prior to the Sale Date and whose COBRA coverage is in effect as of the Sale Date, or whose election period for choosing such COBRA coverage has not ended as of the Sale Date.

8.6    Publicity.  Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no Party shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Parties (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

8.7    Expenses.  Except to the extent otherwise specifically provided in this Agreement, each Party shall bear its respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel and accountants.

8.8    Further Assurances.

(a)    Each Seller agrees that, at any time and from time to time after the Closing, it will, upon the request of Buyer and at Buyer's sole expense, do all such further acts as may be reasonably required to further transfer and assign to Buyer any of the Purchased Assets, or to vest in Buyer good and marketable title to the Purchased Assets.

(b)    Buyer agrees that, at any time and from time to time after the Closing, it will, upon the request of any Seller, do all such further acts as may be reasonably required to cause Buyer to assume the Assumed Liabilities in accordance with this Agreement and as may otherwise be appropriate to carry out the transactions contemplated by this Agreement.

8.9    Governmental Approvals.  Buyer shall be solely responsible for obtaining, and for payment of all costs relating to, any and all Governmental Approvals required in connection with the Contemplated Transactions.  Buyer acknowledges and agrees that procurement of any Government Approvals is not a condition precedent to the Buyer's obligations to consummate the Contemplated Transactions and Buyer shall not be relieved of its obligations to consummate the Contemplated Transactions if any such approvals are not obtained by Buyer.

## ARTICLE IX
## CLOSING AND TERMINATION

9.1    Closing.  The closing (the "Closing") of the Contemplated Transactions shall be held on or within three business days after the Sale Date (or such other date as the Parties may agree in writing), at the offices of Jackson Walker L.L.P., 901 Main Street, Suite 6000, Dallas, Texas 75202.  The date on which the Closing occurs is referred to as the "Closing Date."

9.2    Termination.  This Agreement and the Contemplated Transactions may not be terminated except as follows:

(a)    Upon the mutual written consent of Sellers and Buyer (subject to the approval of the Bankruptcy Court);

(b)     By Sellers if:

(i)     Sellers are not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Section 7.1 or Section 7.3 and such breach is not curable or has not been cured within fifteen (15) days' written notice thereof to Buyer; or

(ii)     any of the conditions set forth in (A) Section 7.1 or (B) Section 7.3 shall not have been fulfilled by [_____] (the "Termination Date"), unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by them prior to the Closing;

(c)     By Buyer if:

(i)     if Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Sellers pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Section 7.1 or Section 7.2 and such breach is not curable or has not been cured within fifteen (15) days' written notice thereof to Sellers; or

(ii)     any of the conditions set forth in Section 7.1 or Section 7.2 shall not have been fulfilled by the Termination Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(d)     By either Sellers or Buyer if there shall be a final non-appealable Order of any nature which is in effect and has the effect of making the Contemplated Transactions illegal, otherwise restraining or prohibiting consummation of the Contemplated Transactions or causing any of the Contemplated Transactions to be rescinded following completion thereof; or

9.3     Effect of Termination.

(a)     Upon the termination of this Agreement in accordance with Section 9.2 hereof, and except as set forth in this Section 9.3, the Parties shall be relieved of any further obligations or liability under this Agreement other than obligations or liabilities for breaches of this Agreement occurring prior to such termination.

(b)     Upon any termination pursuant to Sections 9.2(b)(i) or 9.2(b)(ii)(B), Sellers shall be entitled to retain the Cash Deposit as liquidated damages for expenses incurred in connection with this Agreement.

(c)    Upon any termination pursuant to Sections 9.2(a), 9.2(b)(ii)(A), 9.2(c) or 9.2(d), Sellers shall return the Cash Deposit to Buyer within three (3) days of such termination by wire transfer of immediately available funds.

(d)    Notwithstanding anything to the contrary contained herein, the provisions of this Section 9.3, Section 8.7 and Article XI shall survive any termination of this Agreement.

## ARTICLE X
## TAX MATTERS

10.1    <u>Filing of Returns</u>.  In connection with the preparation and filing of Tax Returns as of and after the Sale Date, Buyer and Sellers shall cooperate and exchange information as reasonably required to accomplish the matters contemplated by this Article X.

10.2    <u>Transaction Taxes</u>.  Buyer shall bear and be responsible for paying any sales, use, stamp, transfer, documentary, registration, business and occupation and other similar taxes (including related penalties (civil or criminal), additions to Tax and interest) imposed by any Governmental Authority with respect to the transfer of the Purchased Assets to Buyer ("<u>Transaction Taxes</u>"), regardless of whether any Tax authority seeks to collect such taxes from Sellers or Buyer.  Buyer shall also be responsible for (i) administering the timely payment of such Transaction Taxes directly to the correct Tax authorities, (ii) defending or pursuing any proceedings related thereto, and (iii) paying any expenses related thereto.  Sellers shall give prompt written notice to Buyer of any proposed adjustment or assessment of any Transaction Taxes with respect to the Contemplated Transactions.  In any proceedings, whether formal or informal, Sellers shall permit Buyer to participate and control the defense of such proceeding with respect to such Transaction Taxes, and shall take all actions and execute all documents required to allow such participation.

10.3    <u>Tax Refunds</u>.  Any Tax refunds (including any interest related thereto) received by Buyer, its affiliates or successors relating to the Purchased Assets and to Tax periods or portions thereof ending on or before the Sale Date shall be for the account of Sellers, and Buyer shall pay over to Sellers any such amount within five business days of receipt thereof.  Buyer shall, if Sellers so request and at Sellers' direction and expense, file or cause its Affiliates to file for and obtain any Tax refunds with respect to the Purchased Assets and to Tax periods or portions thereof ending on or before the Sale Date.

10.4    <u>Tax Prorations</u>.  As to any Purchased Assets acquired by Buyer, Sellers and Buyer shall apportion the liability for real and personal property taxes and ad valorem taxes ("<u>Periodic Taxes</u>") for all Tax periods including but not beginning or ending on the Sale Date (the "<u>Proration Periods</u>").  The Periodic Taxes described in this Section 10.4 shall be apportioned between Sellers and Buyer as of the Sale Date, with Buyer liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the numerator of which is the number of days remaining in the Proration Period including and after the Sale Date, and the denominator of which is the total number of days covered by such Proration Period.  Sellers shall be liable for that portion of the Periodic Taxes for the Proration Period for which Buyer is not liable under the preceding sentence.  Buyer and Sellers shall pay or be reimbursed for real and personal property taxes (including instances in which such property taxes

18

have been paid before the Sale Date) on this prorated basis. Each Party shall make any payments due to another Party under this Section 10.4 by wire transfer of immediately available funds with three (3) days of receiving notice of such obligation. The Party responsible for paying a Tax described in this Section 10.4 shall be responsible for administering the payment of (and any reimbursement for) such Tax. For purposes of this Section 10.4, the Proration Period for ad valorem taxes and real and personal property taxes shall be the fiscal period for which such taxes were assessed by the relevant Tax authority.

## ARTICLE XI
## GENERAL PROVISIONS

11.1 <u>Bankruptcy Court Approval</u>. This Agreement and the transaction contemplated hereby are contingent upon the approval and authorization of the Bankruptcy Court.

11.2 <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when transmitted via electronic mail to the e-mail address set out below if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), (c) the day following the day (except if not a business day then the next business day) on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third business day following the day on which the same is sent by certified or registered mail, postage prepaid. Notices, demands and communications, in each case to the respective Parties, shall be sent to the applicable address set forth below, unless another address has been previously specified in writing:

        (a)     If to Buyer, to:

                _____

                _____

                _____

                _____

                Attn: _____

                E-mail:_____

                With a copy to:

                _____

                _____

                _____

                _____

                Attn: _____

                E-mail:_____

(b)    If to Sellers, to:

ProTom International, Inc.
1100 Parker Square, Suite 230
Flower Mound, TX 75028
Attn:  Stephen L. Spotts, Chief Executive Officer
E-mail:  sspotts@protominternational.com

With a copy to:

Jackson Walker L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202
Attn:  Kenneth Stohner, Jr., Esq.
E-mail:  kstohner@jw.com

11.3    Survival of Representations, Warranties, Covenants and Agreements.    All representations and warranties made by Sellers in this Agreement shall terminate on the Closing Date upon the purchase of the Purchased Assets by Buyer, and neither Sellers nor their respective Affiliates shall have any liability after the Closing Date for any breach of any representation or warranty.  Except as specifically set forth otherwise in the Agreement, all covenants and agreements of Sellers shall lapse at, and be of no further force and effect following, the Closing.

11.4    Binding Effect.  Except as may be otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any trustee, responsible Person, estate administrator, representative or similar Person appointed for or in connection with the Chapter 11 Case or in any subsequent case under the Bankruptcy Code in which any Seller is a debtor. Except as otherwise provided in this Agreement, nothing in this Agreement is intended or shall be construed to confer on any Person other than the Parties any rights or benefits hereunder.

11.5    Headings.  The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

11.6    Exhibits and Schedules.    The Exhibits and Schedules referred to in this Agreement shall be deemed to be an integral part of this Agreement.

11.7    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document.

11.8    Governing Law.  Except to the extent inconsistent with the Bankruptcy Code (in which case the Bankruptcy Code shall govern), this Agreement shall be governed by and construed under Texas law, without regard to conflict of laws principles. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the Parties in the Bankruptcy Court, or, if the

Bankruptcy Court does not have jurisdiction, in the courts of the State of Texas, County of Dallas, or, if it has or can acquire jurisdiction, in the United States District Court for the Northern District of Texas, and both of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere it the world.

11.9    _Waivers_.  Compliance with the provision of this Agreement may be waived only by a written instrument specifically referring to this Agreement and signed by the party waiving compliance.  No course of dealing, nor any failure or delay in exercising any right, shall be construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

11.10    _Pronouns_. The use of a particular pronoun herein shall not be restrictive as to gender or number but shall be interpreted in all cases as the context may require.

11.11    _Modification_.  No supplement, modification or amendment of this Agreement shall be binding unless made in a written instrument which is signed by all of the Parties and which specifically refers to this Agreement.

11.12    _Assignment_.  No assignment by any Party of this Agreement or any right or obligation hereunder may be made without the prior written consent of all other Parties, and any assignment attempted without such consent will be void _ab initio_.

11.13    _Entire Agreement_.  This Agreement and the agreements and documents referred to in this Agreement or delivered hereunder are the exclusive statement of the agreement among the Parties concerning the subject matter hereof.  All negotiations among the Parties are merged into this Agreement, and there are no representations, warranties, covenants, understandings or agreements, oral or otherwise, in relation thereto among the Parties other than those incorporated herein and to be delivered hereunder.

11.14    _Severability_. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, the legality, validity, and enforceability of the remaining provisions of this Agreement shall not be affected thereby, and in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be legal, valid, and enforceable.

INTENDING TO BE LEGALLY BOUND, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

[_____]

By: _____
Name:
Title:

**SELLERS:**

PROTOM INTERNATIONAL, LLC

By: _____
Name:
Title:

PROTOM INTERNATIONAL, INC.

By: _____
Name:
Title:

**SCHEDULES**

**TO**

**ASSET PURCHASE AGREEMENT**

**by and among**

**[BUYER],**

**ProTom International, LLC**

**and**

**ProTom International, Inc.**

13077794v.6

**Schedule 1.1(a)**
**Transferred Intellectual Property Rights**

| U.S. Trademarks | |
|---|---|
| Mark | Registration No. |
| RADIANCE 330 | 4,250,866 |
| PROTOM | unregistered |
|  | unregistered |
| PROTOM INTERNATIONAL, INC. | unregistered |
| FIDELITY BEAM SCANNING | unregistered |
| PROTOM TOMOGRAPHY | unregistered |

**U.S. Copyright Registrations** - None.

**Domain Names** - protominternational.com

| Rights Received Under IP License Agreements | |
|---|---|
| Agreement | Date |
| Amended Agreement between ProTom International, LLC and ZAO PROTOM | Effective April 22, 2008 |
| Agreement by and between ProTom International, Inc. and Pyramid Technical Consultants, Inc., | Effective November 29, 2011 |

| Patents | | |
|---|---|---|
| Name | Issued Patent Number | Patent Application Number |
| Treatment Delivery Control System and Method of Operation Thereof | 8907309 | |
| Charged Particle Translation Slide Control Apparatus and Method of Use Thereof | | 62/111,964 |

**Schedule 1.1(b)**
**Balakin Patents**

| Issued Patents | |
|---|---|
| Title | Patent No. |
| Charged Particle Beam Injection Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8896239 |
| Multi-Axis Charged Particle Cancer Therapy Method and Apparatus | 8901509 |
| Charged Particle and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8841866 |
| Multi-Field Charged Particle Cancer Therapy Method and Apparatus | 8766217 |
| Charged Particle Cancer Therapy Beam Path Control Method and Apparatus | 8957396 |
| Multi-Field Charged Particle Cancer Therapy Method and Apparatus | 8791435 |
| Charged Particle Beam Extraction Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 7939809 |
| Multi-Field Charged Particle Cancer Therapy Method and Apparatus Coordinated with Patient Respiration | 8129699 |
| Charged Particle Cancer Therapy X-Ray Method and Apparatus | 8045679 |
| Elongated Lifetime X-Ray Method and Apparatus Used in Conjunction With a Charged Particle Cancer Therapy System | 7940894 |
| Semi-Vertical Positioning Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8627822 |
| Charged Particle Beam Acceleration and Extraction Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8067748 |
| Charged Particle Beam Acceleration and Extraction Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8089054 |
| Charged Particle Cancer Therapy System Magnet Control Method and Apparatus | 8373145 |
| Magnetic Field Control Method and Apparatus Used in Conjunction With a Charged Particle Cancer Therapy System | 8188688 |
| Intensity Control of a Charged Particle Beam Extracted From a Synchrotron | 8368038 |
| Charged Particle Cancer Therapy and Patient Positioning Method and Apparatus | 8378321 |

| Issued Patents | |
|---|---|
| Charged Particle Cancer Therapy Patient Positioning Method and Apparatus | 8288742 |
| Charged Particle Cancer Therapy and Patient Breath Monitoring Method and Apparatus | 8309941 |
| Ion Beam Focusing Lens Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8093564 |
| Negative Ion Source Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 7943913 |
| Negative Ion Beam Source Vacuum Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8129694 |
| X-Ray Tomography Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8144832 |
| Tandem Accelerator Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8198607 |
| Proton Beam Positioning Verification Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8178859 |
| RF Accelerator Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8373146 |
| Patient Immobilization and Repositioning Method and Apparatus Used in Conjunction with  a Charged Particle Cancer Therapy System | 8373143 |
| Multi-Field Charged Particle Cancer Therapy Method and Apparatus | 8436327 |
| Synchronized X-Ray/Breathing Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 7953205 |
| Charged Particle Cancer Therapy Dose Distribution Method and Apparatus | 8642978 |
| Method and Apparatus Coordinating Synchrotron Acceleration Periods with Patient Respiration Periods | 8624528 |
| Intensity Modulated Three-Dimensional Radiation Scanning Method and Apparatus | 8569717 |
| Multi-Axis/Multi-Field Charged Particle Cancer Therapy Method and Apparatus | 8614429 |
| Charged Particle Cancer Therapy Beam Path Control Method and Apparatus | 8710462 |
| Multi-Axis/Multi-Field Charged Particle Cancer Therapy Method and Apparatus | 8598543 |
| Charged Particle Cancer Therapy Patient Positioning Method and Apparatus | 8688197 |

| Issued Patents | |
|---|---|
| X-Ray Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8487278 |
| Charged Particle Beam Extraction Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8384053 |
| Charged Particle Cancer Therapy Imaging Method and Apparatus | 8519365 |
| Elongated Lifetime X-Ray Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8229072 |
| Synchronized X-Ray/Breathing Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8374314 |
| Synchrotron Power Cycling Apparatus and Method of Use Thereof | 8378311 |
| Synchrotron Power Supply Apparatus and Method of Use Thereof | 8637833 |
| Charged Particle Extraction Apparatus and Method of Use Thereof | 8399866 |
| Charged Particle Cancer Therapy X-Ray Method and Apparatus | 8625739 |
| Charged Particle Beam Acceleration and Extraction Method and Apparatus Used in Conjunction with a Charged Particle Cancer Therapy System | 8415643 |

| Patent Applications | |
|---|---|
| Title | Application No. |
| Multi-field charged particle cancer therapy method and apparatus coordinated with patient respiration | 13/360,683 |
| Charged particle beam acceleration and extraction method and apparatus used in conjunction with a charged particle cancer therapy system | 13/282,135 |
| Patient Positioning Method and Apparatus | 12/550,379 |
| Proton Tomography Apparatus and Method of Operation Therefor | 13/087,096 |

**Schedule 2.1(a)**
**Tangible Personal Property**

**Wakefield Office Location:**
1 Server
3 printers
1 leased copier/printer
phone system w/ 21 phones & 2 conference phones
12 laptops
9 desktops w/ monitors, keyboard & mice
8 office desks w/ overhead cradenzas & chairs
5 u-shaped desks w/ chairs
12 modular/cubicles desks w/ chairs
square coffee table
conference table w/ 10 chairs
conference table w/ 4 chairs
conference table w/ 8 chairs
conference table w/ 3 chairs
2 projectors
42" touchscreen w/ mac mini
2 drawer filing cabinet
10 guest chairs
 10 whiteboards
Trimos V-1000 Height Gage
 AEMC 8336 Power Pad Tester, No Probes
 Chiller CE50A2ZB3SP Air Cooled
Fluke Digital Multi-meter
BK Precision Power Supply
AEMC Power Quality Meter
 Power supply
 Tandem
Refrigerator
Microwave

**Flower Mound Office Location:**
4 Servers (1 is for Wakefield)
3 printers
1 leased copier/printer
phone system w/ 14 phones & 2 conference phones
7 laptops
7 desktops w/ monitors, keyboard & mice
6 office desks w/ credenzas & chairs
4 cubicles w/ chairs
7 small wood-type desks
conference table w/ 8 chairs

10 guest chairs
4 side tables
6 whiteboards
1 projector
2 5-drawer lateral filing cabinets
Trade show booth
3 cameras currently at a vendor (Forte)
Refrigerator
Microwave


**Located at MPTC, Flint, MI**
7 laptops
2 desktops
2 printers
1 scanner
IBA Lynx detector
IBA Matrix detector
PTW water tank
PTW TN34045 Ion Chamber
PTW T10023 Electrometer, Unidos Webline
PTW TN30013 Ion Chamber
PTW TN34070 Ion Chamber
Standard Imaging T1 REF 92706 Ion Chamber
PTW Precision Barometer
PTW T10038 Electrometer, Tandem XDR
PTW TN34045 Ion Chamber
PTW TN30013 Ion Chamber
PTW TN31015 Ion Chamber
PTW TN34070-2.5 Ion Chamber
Standard Imaging T1 REF 92706 Ion Chamber

**Schedule 2.1(b)**
**<u>Leased Real Property</u>**


1.   1100 Parker Square, Suite 230, Flower Mound, TX 75028
2.   301 Edgewater Place, Suites 120 & 405, Wakefield, MA 01880

**Schedule 2.1(d)**
**Customer Contracts**

1. Purchase Agreement, dated March 14, 2014, between ProTom International, Inc. and The General Hospital Corporation d/b/a Massachusetts General Hospital, and subsequent Change Orders dated August 26, 2014 and March 19, 2015.
2. Business Associate Agreement, dated March 14, 2014, by and between The General Hospital Corporation d/b/a Massachusetts General Hospital and ProTom International, Inc.
3. Service and Maintenance Agreement, dated March 14, 2014, by and between ProTom International, Inc. and The General Hospital Corporation d/b/a Massachusetts General Hospital.
4. Purchase Agreement, dated March 12, 2010, for Proton Therapy System, between McLaren Health Care Corporation and ProTom International, Inc., as amended March 15, 2011.
5. Post-Warranty Co-Op Service and Maintenance Agreement, dated March 12, 2010, by and between ProTom International, Inc. and McLaren Health Care Corporation.
6. Purchase Agreement, dated February 15, 2012, for Proton Therapy System, between Atlantic Health System, Inc. and ProTom International, Inc., as amended July 25, 2012, August 29, 2012, September 28, 2012, December 27, 2012 and February 15, 2013 and as supplemented by the Letter Agreement dated October 28, 2014.
7. Service and Maintenance Agreement, dated February 15, 2012, by and between ProTom International, Inc. and Atlantic Health System, Inc., as amended December 27, 2012.

**Schedule 2.1(e)**
**Vendor Contracts**

1. Supply Agreement #1-0508, effective June 1, 2008, by and between ProTom International, LLC and ZAO PROTOM, and amendments thereto dated: July 30, 2008; October 16, 2008; November 5, 2008; November 26, 2008; (1) December 23, 2008; (2) December 23, 2008; (1) December 25, 2008; (2) December 25, 2008; April 17, 2009; December 22, 2009; January 25, 2010; February 15, 2010; March 10, 2010; June 8, 2010; June 20, 2010; October 15, 2010; December 23, 2010; March 31, 2011; July 5, 2011; October 3, 2011; November 7, 2011; January 31, 2012; February 13, 2012; March 14, 2012; June 5, 2012; July 20, 2012; August 23, 2012; September 23, 2012; December 25, 2012.
2. Supply Agreement #2-0414, dated April 3, 2014, by and between ProTom International, LLC and ZAO PROTOM , as amended April 15, 2015.
3. Supply Agreement #3-0414, dated April 3, 2014, by and between ProTom International, LLC and ZAO PROTOM, as amended May 26, 2014.
4. Agreement between Contractor and Subcontractor, dated May 1, 2014, between ProTom International, Inc. and Forte Automation Systems, Inc. and subsequent Change Orders dated October 17, 2014 and February 16, 2015.
5. Business Associates Agreement, dated May 1, 2014, by and between ProTom International., Inc. and Forte Automation Systems, Inc.
6. Confidentiality Agreement, dated January 24, 2014, by and between ProTom International, Inc. and Forte Automation Systems, Inc.
7. Agreement between Contractor and Subcontractor, dated September 12, 2014, between ProTom International, Inc. and medPhoton GmbHProposal, quote, agreement, dated March 24, 2010, by and between ProTom International, Inc. and Forte Automation Systems, Inc.
8. Business Associates Agreement, dated September 12, 2014, by and between ProTom International, Inc. and medPhoton GMBH
9. Agreement dated June 13, 2011, by and between ProTom International, Inc., Forte Automation Systems, Inc., and McLaren Heath Care Corporation.
10. Proposal, quote, agreement, dated August 4, 2011, by and between ProTom International, Inc. and Forte Automation Systems, Inc.
11. Development and Design Agreement, dated as of November 29, 2011, by and between ProTom International, Inc. and Pyramid Technical Consultants, Inc.
12. Agreement, dated February 16, 2015, by and between ProTom International, Inc. and Shawmut Woodworking & Supply, Inc. d/b/a Shawmut Design and Construction, and subsequent Change Requests dated April 3, 2015 and April 7, 2015.
13. Equipment Purchase Agreement, dated May 28, 2014, by and between ProTom International, Inc. and AccSys Technology, Inc.
14. Confidentiality and Nondisclosure Agreement, dated May 28, 2014, by and between ProTom International, Inc. and AccSys Technology, Inc.
15. Agreement, dated April 6, 2015, by and between ProTom International, Inc. and Baldwin Crane and Equipment Corporation

**Schedule 2.1(f)**
**Other Contracts**

1. Amended Agreement, dated April 22, 2008, by and between ProTom International, LLC, ZAO PROTOM and Professor V.E. Balakin, as amended October 16, 2008, March 26, 2009, March 21, 2012, December 30, 2013, and July 1, 2014.
2. Agreement and Amendment, dated March 12, 2010, by and among ProTom International, Inc., ProTom International, LLC, ZAO ProTom, a closed joint-stock company established under the laws of the Russian Federation, Professor V.E. Balakin, and McLaren Health Care Corporation.
3. Amended and Restated Rights Agreement, dated March 15, 2011, by and between ProTom International, Inc. and ProTom International, LLC.
4. Lease Agreement, dated May 19, 2010, by and between ProTom International, Inc. and Parker Properties 1100, LTD., subsequently purchased by RAB Properties, LLC effective as of November 25, 2014.
5. Lease, dated June 3, 2014, by and between 401 Edgewater LLC and ProTom International, Inc.
6. Research Agreement, effective October 1, 2014, by and between Massachusetts Institute of Technology and ProTom International, Inc., and as supplemented by the Letter Agreement dated February 20, 2015.
7. Premier Advantage Agreement, by and between ProTom International, Inc. and Konica Minolta Business Solutions U.S.A., Inc.

**Schedule 2.1(g)**
**<u>Permits</u>**

U.S. Food and Drug Administration 510(k) Clearance for Radiance 330 Proton Therapy System

**Schedule 2.2(f)**
**Other Excluded Assets**


1. Secured Promissory Note and Security Agreement in the amount of $128,400 between Philip A. Incarnati 2010 Irrevocable Trust dated October 4, 2010 (Borrower) and ProTom International, Inc. (Lender) dated December 23, 2010.
2. Secured Promissory Note and Security Agreement in the amount of $156,400 between Gregory R. Lane (Borrower) and ProTom International, Inc. (Lender) dated September 9, 2011.
3. Letter agreement dated June 11, 2008 between ProTom International, Inc. and Dmitri Sivan with respect to a $8,250 funding obligation secured by 825,000 shares of ProTom's common stock.
4. Letter agreement dated September 7, 2010 between ProTom International, Inc. and H. Conner Company, Inc. with respect to a $6,692.37 funding obligation secured by 669,237 shares of ProTom's common stock.
5. Secured Promissory Note and Security Agreement in the amount of $96,400 between Robert Herron (Borrower) and ProTom International, Inc. (Lender) dated December 23, 2010.

**Schedule 4.3**
**Allocation**

[To come]

**Schedule 5.3**
**<u>Brokers or Finders</u>**

[Key Banc]

**Schedule 6.6**
**Brokers or Finders**

[To come from Buyer]