Kenneth Stohner, Jr.
State Bar No. 19263700
JACKSON WALKER L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 953-6000 - Telephone
(214) 661-6803 – Telecopier

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **PROTOM INTERNATIONAL, INC.** | § | **CASE NO. 15-32065-BJH-11** |
| **PROTOM INTERNATIONAL, LLC** | § | **CASE NO. 15-32066-SGJ-11** |
| | § | |
| **DEBTORS.** | § | **CHAPTER 11** |
| | § | |

**DECLARATION OF STEPHEN L. SPOTTS IN SUPPORT OF DEBTORS' VOLUNTARY PETITIONS UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE AND EMERGENCY FIRST DAY MOTIONS**

I, Stephen L. Spotts, state as follows:

## INTRODUCTION

1. I am the President and Chief Executive Officer of ProTom International, Inc. ("***ProTom***"), and the Managing Member of ProTom International, LLC ("***ProTom LLC***"). I have been President and Chief Executive Officer of ProTom since its inception in March 2008. I have been actively involved in the management of the Debtors' business operations. These efforts included not only regular operations, but I have also been actively engaged in addressing the Debtors' cash and liquidity issues, as well as implementing other pre-bankruptcy initiatives.

2. I have recently been actively engaged in the preparations for the Debtors to enter Chapter 11. I have reviewed and was involved in the Debtors' preparations of its business plans, budgeting, decision to file Chapter 11, and all relief sought in the Emergency First Day Motions.

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions – Page 1 of 19**
**13068715v.3**

3. I am an accomplished executive in the healthcare and medical technology industry with more than 30 years of continued experience. I am qualified in guiding businesses through new development and acquisition. My career includes experience with Marriott Healthcare Services, Mariner Health Hospital Services Group and Pathology Partners, Inc. I have served as a director of publicly owned healthcare corporations.

4. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion, based upon my experience and knowledge of the Debtors' operations and financial condition or information reported to me in the course of my duties by the Debtors, officers or employees. If I were called to testify, I would testify competently to the facts set forth herein. I am authorized to submit this affidavit.

## BACKGROUND

### Formation

5. ProTom International, LLC (the "***LLC***") was formed in April 2007, for the purpose of negotiating and entering into an agreement with ZAO Protom, a company established under the laws of the Russian Federation ("***ZAO***"), and its sole owner, Vladimir E. Balakin ("***Balakin***"), which would afford the LLC the exclusive rights to sell the compact accelerator developed by Balakin and used in the proton therapy treatment of patients ("the ***ZAO System***") and to obtain a license to use technology supporting the ZAO System (the "***ZAO Technology***"). The ZAO System and the ZAO Technology were identified as a major component necessary for a proton therapy system that was lighter and less expensive than proton therapy systems then in operation in the Unites States, without reducing the quality and efficiency of patient treatment. This technology has been the basis on which ProTom International, Inc. has developed its Radiance 330® Proton Therapy System (the "***Radiance 330®***").

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions –** **Page 2 of 19**
**13068715v.3**

6. An original agreement was entered into between ZAO, Balakin and the LLC on November 15, 2007. The original agreement was superseded by an Amended and Restated Agreement dated April 22, 2008, which, as amended, remains in place (the "***ZAO Agreement***"). Under the terms of the ZAO Agreement, the LLC, subject to conditions specified in the ZAO Agreement, has the exclusive right to purchase ZAO Systems and use the ZAO Technology for patient treatment in the United States.

7. ProTom International, Inc. (the "Company") was formed as a Delaware corporation March 28, 2008, by the founders of the LLC as a vehicle to further develop and commercialize the ZAO System and the ZAO Technology. The LLC and the Company are parties to an Amended and Restated Rights Agreement dated March 15, 2011 (the "***Rights Agreement***"). Under the terms of the Rights Agreement, the LLC assigned to the Company the LLC's right to purchase directly from ZAO the ZAO System and the rights to the ZAO Technology.

8. The LLC conducts no business operations and has no employees. Its sole assets are the ZAO Agreement and the Amended and Restated Rights Agreement. All business operations are conducted in and through the Company.

**Business**

9. The Company is a medical technology company focused on proton therapy for cancer patients. ProTom's mission is to increase the availability and accessibility of proton therapy in order to improve treatment outcomes and quality of life for cancer patients. The Company holds the exclusive U.S. rights to patented technology originally developed at the Lebedev Physics Institute and licensed through ZAO. The Company believes this proprietary technology incorporated into the *Radiance 330*® positions the Company to significantly lower

the capital and operating costs of proton centers and accelerates the adoption of this important treatment tool in the fight against cancer.

10. Utilizing the proprietary technology incorporated into the *Radiance 330*®, the Company aims to increase the efficacy and cost effectiveness of proton therapy and expand market penetration of this valuable treatment technique for cancer patients. The Company's compact accelerator design dramatically reduces the size, weight and cost of new treatment centers, facilitating its deployment in smaller markets that may lack the patient volume necessary to support a larger facility. The Company's proprietary technology yields meaningful advances in proton treatment capabilities, delivering increased accuracy and precision along with increased patient throughput.

**Oncology Treatment Market**

11. The three primary methods of treating cancer are radiation therapy, chemotherapy and surgery, each of which can be used alone or in combination depending on the type and staging of cancer being treated. Radiation therapy is a proven, effective and widely accepted form of treatment for many types of cancer. According to the American Society for Radiation Oncology ("ASTRO"), nearly two-thirds of all cancer patients in the United States, or one million new patients annually, will receive radiation therapy during the course of their treatment.

12. Proton therapy is a form of external beam radiation therapy that employs beams of protons generated by a cyclotron or synchrotron as opposed to x-ray beams from a conventional linear accelerator. The principal advantage of proton therapy is that a proton beam's signature energy distribution curve allows for significantly greater precision in targeting tumor cells with less dose to nearby healthy tissue.

13. Growing recognition of the clinical benefits of proton therapy combined with an expanding body of clinical evidence has stimulated increased interest in the utilization of protons

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions – Page 4 of 19**
**13068715v.3**

for cancer treatment and fueled efforts to develop next-generation proton accelerators that have a size and price point below that of conventional systems. The potential availability of next-generation systems, along with early marketing activities from selected equipment vendors, has resulted in increased awareness among clinicians of the benefits of proton radiation therapy and generated significant interest in this new technology.

**Intellectual Property**

14. As of April 30, 2015, the Company had filed in Professor V.E. Balakin's name 45 U.S. patent applications, 41 of which have been issued as patents by the U.S. Patent and Trademark Office. Current patents are interconnected, creating an overlapping "wall" of patent protection for the system. The Company holds exclusive U.S. rights to the technology.

15. As of April 30, 2015, the Company has filed in its name two U.S. patent applications, one of which has been issued as a patent by the U.S. Patent and Trademark Office. The Company is in the process of filing an additional patent and expects to file more in the future in its own name.

16. In addition to patents, the Company relies upon unpatented trade secrets and know-how and continuing technological innovation to develop and maintain its competitive position. The Company seeks to protect its proprietary information, in part, using confidentiality agreements with its commercial partners, collaborators, employees and consultants and invention assignment agreements with its employees. The Company also has confidentiality agreements or invention assignment agreements with some of its commercial partners and consultants.

**Capitalization**

17. The initial capitalization of the Company was $55,000 through the issuance of Common Stock to its eight founders. The Company raised $3,375,000 in May and June, 2008 through the issuance of Series A Preferred Stock to 13 persons and entities in a private placement

(the "***Series A Placement***"). Additional funds were raised in 2009 from a bridge financing pursuant to a private placement (the "***Bridge Financing***"), with. approximately 52 individuals and entities participating. These funds plus accrued interest totaling approximately $3,739,380 were converted into Series A Preferred Stock in April 2010. Seventeen individuals participated in a subsequent private placement raising funds in 2012 through early 2014 (the "***Second Bridge Financing***"); approximately $1,417,500 of these funds including accrued interest converted into Common Stock in June 2014. See the table below for an overview of the above-described capitalization.

| Description | Participants | Raise | Class of Stock | Date(s) |
|---|---|---|---|---|
| Initial capitalization | 8 founding individuals and entities | $55,000 | Common | Company inception |
| Series A Placement | 13 individuals and entities | $3,375,000 | Series A Preferred | May-June 2008 |
| Bridge Financing | 52 individuals and entities | $3,739,380 | Series A Preferred | April 2010 |
| Second Bridge Financing | 17 individuals | $1,417,700 | Common | June 2014 |
| | | $8,587,080 | | |

These funds enabled the Company to develop its Radiance 330® in a manner sufficient for the Company to market the Radiance 330® to potential purchasers. Beginning in mid-2009, the Company actively began to market the Company's proton therapy system, later named and trademarked the Radiance 330®.

18. In June 2014, the Company entered a lending relationship with Michaelson Capital Partners LLC ("***Michaelson***") resulting in a secured loan from Michaelson in the amount of $7,250,000 secured by substantially all the assets of the Company. In December 2014, the Michaelson secured loan was increased to $10,138,091.

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions –** **Page 6 of 19**
**13068715v.3**

**Sale of Radiance 330® Systems**

19. The Company has entered into three Purchase Agreements related to the sale of its Radiance 330®. The first purchase agreement is the Purchase Agreement dated March 12, 2010 between the Company and McLaren Health Care Corporation ("***McLaren***"), (the "***McLaren Agreement***") for the sale and installation of the Radiance 330® at McLaren ("***McLaren Project***"). Entry into the McLaren Agreement was a key moment in the Company's history because it provided the Company with credibility in the marketplace and a partner in developing the Radiance 330® to facilitate FDA 510(k) clearance of the Radiance 330® and readiness for patient treatment. The McLaren Agreement also provided for contract payments that funded the Company's continued operations. The Radiance 330® installed at McLaren is not yet ready for patient treatment, and McLaren has advanced to the Company funds in excess of contract payments called for under the McLaren Agreement. McLaren has sent to ProTom a notice of termination under the McLaren Agreement, but the Company has informed McLaren that the Company disputes McLaren's right to terminate.

20. As consideration for McLaren's entry into the McLaren Agreement, ProTom issued to McLaren shares of common stock and Series A Preferred Stock representing 20% of ProTom's fully diluted equity. In March 2011, ProTom issued additional shares of common stock and Series A Preferred Stock to McLaren in consideration for McLaren's entry into an amendment to the McLaren Agreement that advanced the timing of payments to be made by McLaren to ProTom under the McLaren Agreement. McLaren currently holds 35% of the fully-diluted equity of the Company. In addition, two officers of McLaren, Philip Incarnati and Greg Lane, were added as directors of the Company in which capacity they served until their resignations on March 31, 2015. Mr. Incarnati served as Chairman of the Board.

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions –** **Page 7 of 19**
**13068715v.3**

21. On February 15, 2012, the Company and Atlantic Health Systems, Inc. ("***AHS***") entered into a Purchase Agreement for Proton Therapy System (the "***AHS Agreement***") related to the sale of the Radiance 330® for installation in a multi-room proton therapy facility to be built by AHS in central New Jersey ("***AHS Project***"). Under the terms of the AHS Agreement, as amended, ASH has made payments to ProTom to date aggregating $5,000,000, but AHS has not yet finalized its order for a Radiance 330® under the terms of the AHS Agreement. The AHS Agreement provides that AHS is not obligated to finalize the order for the Radiance 330® until there have been 30 continuous days of scheduled patient treatment at the McLaren proton therapy facility.

22. On March 14, 2014, the Company and The General Hospital Corporation d/b/a Massachusetts General Hospital ("***Mass General***") entered into a Purchase Agreement for Radiance 330® (the "***MGH Agreement***") for the sale and installation of the Radiance 330® at a single-room proton therapy center at Mass General ("***MGH Project***"). The installation of the Radiance 330® at Mass General is underway and Mass General and the Company currently anticipate that first patient treatment using the Radiance 330® will commence at Mass General in the first half of 2017.

23. Under the terms of each of the McLaren Agreement, the AHS Agreement and the MGH Agreement, following the commencement of patient treatment at the proton therapy facilities identified in those agreements, the Company will provide continuing service and maintenance obligations at each facility pursuant to service and maintenance agreements between the Company and each of McLaren, AHS and Mass General. These service agreements provide for initial terms of up to ten (10) years, with automatic renewal terms (subject to the

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions –** **Page 8 of 19**
**13068715v.3**

action of either party to terminate) and for substantial annual service fee payments to the Company.

**FDA Clearance**

24. In order for the Radiance 330® to be utilized for patient treatment clearance as a medical device by the U.S. Food and Drug Administration ("***FDA***") was required. In March 2014, the Company received FDA 510(k) clearance of the Radiance 330®. This clearance is of significant value to the Company as it approves the Radiance 330® for patient treatment in a commercial operation.

**Assets and Liabilities**

25. ProTom's assets consist primarily of (i) its rights under the ZAO Agreement to sell and market the ZAO System and ZAO Technology, principal components of the Radiance 330®, (ii) the FDA 510(k) clearance of the Radiance 330® for patient treatment; (iii) the patents and intellectual property developed by the Company for the design, assembly and operation of the Radiance 330®, (iv) the McLaren Agreement, AHC Agreement and MGH Agreement, and (v) various personal property and equipment.

26. ProTom's liabilities consist primarily of $10 million in senior secured debt of Michaelson, $2 million in vendor or trade debt and approximately $12 million in overpayments by McLaren under the McLaren Agreement which is disputed.

**Reasons for Filing Chapter 11**

27. As a pioneer in developing the Radiance 330®, there were unforeseen problems, events and vendor failures which resulted in costs and expenses for the McLaren Project greater than the original projected cost in the McLaren Agreement and also delayed the time for completion and first patient treatment. As a result, there was a delay in other contracts and negative impact on the ability of the Company to raise new equity. There have been

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions – 13068715v.3** **Page 9 of 19**

significantly fewer problems in the MGH Project as a result of experience from the work performed for the McLaren Project.

28. In March, 2015, the McLaren directors verbally committed to fund an additional $5-$10 million to ProTom as new equity or debt. ProTom relied on this commitment in continuing its work on the McLaren Project and MGH Project. Instead of following through with this commitment, at the end of March, 2015 (i) the two McLaren directors on ProTom's board, including the Chairman, resigned from the board, and (ii) McLaren served written notice on ProTom that it was exercising its right to terminate the McLaren Agreement and refused to fund the additional $5-$10 million. ProTom disputed the attempted termination by McLaren.

29. As a result of all the foregoing, ProTom failed to meet certain financial covenants under the Michaelson Loan Documents and Michaelson declared a default on April 1, 2015. As a result of such declaration, Michaelson initiated actions resulting in the sweeping of the Company's depository account at Regions Bank causing the transfer of approximately $4.6 million from the Company's depository account to an account under Michaelson's control on or about April 13, 2015. Michaelson subsequently provided limited funding to the Company for certain operating expenses and payroll. Michaelson has agreed to provide DIP financing to the Company to enable the Company to conduct a § 363 sale of its assets. The Company believes this approach provides the best opportunity to realize value for all creditors and equity holders and provide for the completion of the McLaren Project, MGH Project and AHS Project.

## FIRST DAY MOTIONS

30. I have reviewed the various pleadings filed contemporaneously herewith and discussed herein (the "***First Day Motions***"). The allegations contained in each of the First Day Motions are true and correct to the best of my knowledge, information and belief, and as more specifically described herein.

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions –** **Page 10 of 19**
**13068715v.3**

***Debtors' Emergency Motion to Authorize Maintenance of Certain Prepetition Bank Accounts and Cash Management System (the "Bank Account Motion")***

31. Prior to commencing the Cases, the Debtors had their bank accounts in two (2) banks. The Debtors' Main Operating Account is maintained at Regions Bank (the "***Regions Account***"). The Debtors are filing a separate motion requesting authorization to continue to pay employees. The payroll is administered through a third party payroll service, PayCom. The Debtors wire the funds to PayCom and PayCom then disburses the funds to employees after deducting taxes. The employees' flexible spending account contributions amount is administered by Discovery Benefits. The funding of PayCom and Discovery Benefits is made through the Regions Account. Accordingly, it is necessary to maintain the Regions Account and this account is anticipated to remain open so that payroll and FSA payments will clear without incident (subject to the relief granted in the motion).

32. The maintenance of the Regions Account will accomplish the goal of minimizing the disruption to the Debtors' operations and satisfying the United States Trustee's operating guidelines. Reports by the Debtors would afford a complete accounting of the Debtors' funds and would provide required information to the United States Trustee that the operating guidelines would be observed. The Debtors maintained an account at Citibank which will be closed.

***Emergency Motion to Authorize Payment of Prepetition Wages, Salaries, Reimbursable Employee Expenses and Benefits in the Ordinary Course of Business***

33. As of May 8, 2015, the Debtors employed approximately 24 salaried employees. Approximately eight employees work at the Corporate office in Flower Mound, Texas, one employee works in ProTom's office in Birmingham, Alabama and approximately 15 employees work in ProTom's office in Wakefield, Massachusetts.

34. As of May 4, 2014, the Debtors utilize services of four contractors, all of whom work in ProTom's office in Wakefield, Massachusetts.

35. The payroll is administered and paid through PayCom, a third party administrator. Debtors forward to PayCom two days in advance the amount which covers salaries and taxes. PayCom issues checks or direct deposits to the employees. All employee benefits are deducted and paid directly by Debtors. Each employee is paid his or her salary and wages on a semi-monthly basis. Salaried employees and contractors are paid current twice monthly for the immediately preceding half-month pay period. Accordingly, the Debtors made their usual payroll on April 28, 2015 for employees and contractors, which employees and contractors received on April 30th. The next payroll date is May 15, 2015, which must be funded on May 13, and includes compensation for services rendered by contractors from April 30 2015 through May 15, 2015. The Debtors estimate that wages and salaries paid for the May 15th payroll will be approximately $130,000, a portion of which will relate to prepetition salaries, and wages.

36. The Company is heavily dependent on its personnel to provide continuing services under the MGH Agreement and McLaren Agreement. If the Company does not pay its employees' wages owed when due, employees will quit and the Company will suffer irreparable harm. The Company does not operate under any collective bargaining agreements.

37. The Company provides its full-time employees with a choice of insurance medical plans. In some cases, both the Company and the employees contribute to the premium payment requirements for these plans; however, a significant portion of the premiums are paid by the Company, including AD&D, long-term disability and life insurance. This is a material benefit to the employees and a part of employment and hiring incentives. Without the Company subsidizing a portion of the premiums, many employees likely would not have been able to

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions –** **Page 12 of 19**
**13068715v.3**

afford the health care coverage provided under the existing plans on their own. The Company pays these premiums monthly, and withholds employee portions from wages. If the Company is not permitted to continue and pay the insurance premiums, employees will lose their health care and likely suffer economic hardship.

38. The Company does not believe any employee is owed wages of more than $12,475 for the pre-petition period for the May 15 payroll. The success of the Company's efforts to reorganize effectively will be dependent on the continued employment and sustained morale of the Company's employees. To maintain employee stability and productivity, it is important that Employee wages and business benefits be paid, in full, and the insurance benefits be continued post-petition. If the employees' wages, bonuses, reimbursements and insurance benefits are not received in the ordinary course of business or the insurance benefits are discontinued, employee morale would deteriorate, employees would likely quit, and employees could become personally liable for non-reimbursed business or medical claims expenses, which, in turn, would substantially and adversely affect the Company's ability to complete a successful reorganization. The payment of the Employee wages and insurance benefits are necessary to the effective reorganization of ProTom.

39. If the Employee wages and insurance benefits are not paid in the ordinary course of business, the employees will suffer personal hardship, will potentially not receive needed medical services, and in some cases, would be unable to pay basic living expenses. Such a result would be to the detriment of the employees, destabilize the Debtors and harm the Debtors' business and reorganization efforts. Any loss of employees would disrupt the Debtors' business and would negatively impact the value of the estate. Accordingly, if the employees do not

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions –** **Page 13 of 19**
**13068715v.3**

receive the payments herein described, the Debtors may experience difficulty in preserving and protecting the value of the Company.

40. Certain employees have accrued paid time off consisting of sick days and vacation that has not been utilized. In the ordinary course of its business, the Debtors generally do not pay employees for unused vacation except upon termination. The Debtors estimate that as of the Petition Date, the employees have accrued paid time off in the amount of approximately $137,723.

41. Prior to the Petition Date and in the ordinary course of business, certain employees incurred business expenses including, but not limited to, travel, lodging, meals, and expenses associated with the recent closing of several store locations. Employees pay for certain expenses with a corporate American Express card, and other expenses may be paid directly by the employee and submitted for reimbursement. The Debtors pay the American Express charges directly; however, the employee maintains personal liability for any amounts not paid by the Company.

42. All such expenses were incurred on behalf of the Debtors in the ordinary course of business and with the expectation that such expenses would be reimbursed in accordance with past practice. The Debtors estimate that the prepetition expense reimbursements, including employee American Express charges, will be approximately $8,400.

43. The Debtors request authority to pay any such prepetition reimbursement obligations immediately as and when presented for reimbursement by employees, including such related American Express card expenses, in the ordinary course of business.

***Payment of Prepetition Healthcare and Insurance Claims***

44. The Debtors maintain a health insurance program for their employees (the "***Insurance Program***"). Through the Insurance Program, certain of the Debtors' employees receive health and dental insurance, life insurance, short term and long term disability insurance, and flexible spending accounts for their employees make payroll deductions. The Debtors maintain the following plans listed below (the "***Plans***"):

| Benefit Plan | Administrator |
|---|---|
| Medical | Blue Cross Blue Shield of Alabama |
| Dental | Principal Financial / PLIC |
| Vision | VSP |
| Life (Group Plan) | Principal Financial / PLIC |
| AD&D | Principal Financial / PLIC |
| Flexible Spending Account | Discovery Benefits |

45. The Debtors pay a portion of premiums, or in some cases all premiums, and some employees make contributions via salary deduction, both in varying amounts depending on plans chosen. The amount of $27,500 was due on the plans for premiums for the month of May, a portion would constitutes prepetition liabilities on account of unpaid premiums.

***Payment of Prepetition Expenses Related to 401(k) Plan***

46. The Debtors maintain a 401(k) plan (the "***401(k) Plan***") administered by Qualified Plans, which participating employees may defer a portion of their salary to help meet their future financial goals. The Debtors withhold from employee wages for contributions, but do not match or contribute to the 401(k) Plan. The Debtors seek authorization to continue to collect and distribute any and all prepetition amounts attributable to the 401(k) Plan.

***Payment of Trust Fund Taxes***

47. The Debtors are required by law to withhold from an employee's wages amounts related to federal, state, and local income taxes, social security taxes, and Medicare taxes (the

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions – Page 15 of 19**
**13068715v.3**

"***Employee Taxes***"). The Debtors are required to (i) match the social security and Medicare taxes; (ii) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance; and (iii) remit these payroll taxes to various taxing authorities. The Debtors estimate that the Employee Taxes relating to the May 15th payroll will total approximately $10,400, a portion of which will relate to prepetition Employee Taxes.

48. The Debtors submit that, because the Employee Taxes constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estate, given that the relevant taxing authorities would hold priority claims pursuant to Bankruptcy Code § 507(a)(8) in respect of such obligations. Moreover, the monies payable for trust fund taxes generally are not property of a debtors' estate. *See Begier v. IRS*, 496 U.S. 53 (1990).

49. Accordingly, the Debtors seek authorization to collect and pay any and all taxes attributable to prepetition wages as required by state and federal law in the ordinary course of business.

***Debtors' Emergency Motion for Interim and Final Orders Authorizing DIP Financing Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) (the "DIP Financing Motion")***

50. The Debtors maintain a secured lending relationship with Michaelson under that certain Amended and Restated Secured Convertible Promissory Note dated as of December 29, 2014 in the principal amount of $10,138,091, amending the original Secured Convertible Promissory Note dated June 10, 2014, in the original principal amount of $7,250,000 (the "***Michaelson Secured Loan***"). The Michaelson Secured Loan is secured by substantially all the assets of the Debtors pursuant to a Security Agreement dated June 10, 2014, as amended on December 29, 2014.

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions – 13068715v.3** **Page 16 of 19**

51. The Debtors require the use of the cash to pay their necessary operating expenses, including, but not limited to, employee wages and benefits, rent, insurance, and utilities in order to continue operations and preserve the value of their assets for the benefit of all creditors and parties-in-interest. The Debtors and Michaelson have reached an agreement on the terms of DIP financing ("***DIP Financing***"). The Debtors request DIP Financing, on an interim basis, pursuant to the proposed agreed interim DIP Financing Order (the "***Proposed Interim Order***") attached to the DIP Financing Motion as **Exhibit A**, and the proposed agreed interim budget attached to the DIP Financing Motion as **Exhibit B** (the "***Proposed Interim Budget***").

52. As of the Petition Date, the Debtors do not have available cash to fund the Debtors' operations during these Cases. Accordingly, the Debtors face "immediate and irreparable harm to the estate" absent the emergency consideration of the relief requested in the DIP Financing Motion. The immediate use is necessary, and it will stabilize the Debtors' operation by paying ordinary, post-petition operating expenses, as well as any court approved prepetition expenses that may be at issue. Without approval of the Proposed Interim Order, the Debtors will not be able to function as a going concern, and will not be able to proceed to consideration of a sale of assets or a plan of reorganization.

53. An immediate need exists for the Debtors to obtain approval of the use of Interim DIP Financing in order to meet key operating expenses as described above and as identified in the Proposed Interim Budget. Without approval of the Proposed Interim Order, the Debtors will essentially be forced to cease operations and liquidate. This would have a severe negative impact upon the Debtors' going concern value and ability to successfully create value for all creditors. The Debtors' business, as a going concern, has a value far in excess of any value that might be obtained in a chapter 7 liquidation. A complete shutdown of the Debtors' business, even for a

short period, would result in the loss of employees and creditors receiving substantially less from the enterprise than going concern value.

***Debtors' Emergency Motion for Interim and Final Order Providing Adequate Assurance of Utility Payments (the "Utility Motion")***

54. The Debtors currently use telephone and internet services from several utility providers. A list of each Utility is attached as **Exhibit A** to the Utility Motion (the "***Utility Service List***"). The Debtors estimate that their average monthly obligations for services rendered by Utilities currently approximate $4,070.

55. Uninterrupted utility service is critical to the ability of the Debtors to operate and maintain the value of their business and to maximize value for the benefit of their creditors. The Debtors currently pay for the telephone and internet utilities at the Wakefield, Massachusetts office and their corporate office in Flower Mound, Texas. The Debtors could not operate their business at these facilities without utility service. Should any utility refuse or discontinue service, the Debtors would be forced to cease operations at the affected location. Such a cessation would substantially disrupt operations, which could irreparably harm and jeopardize the reorganization efforts or other objectives of the Debtors.

56. The Debtors propose that a total of $2,035 be allocated pro rata among the Utilities, and provided as deposit to each Utility (each, an "***Adequate Assurance Deposit***") based on each such Utility's average monthly bills to the Debtors. The Debtors submit that the Adequate Assurance Deposit together with their demonstrated ability to pay future utility service in the ordinary course of business (collectively, the "***Proposed Adequate Assurance***") constitutes sufficient adequate assurance of future payment by the Debtors.

57. The Debtors have generally paid their utility bills on a timely basis, and there are no material pre-petition payment defaults or arrearages, other than: (i) accrued pre-petition

charges which had not yet been billed or which were not yet due or payable as of the Petition Date; or (ii) amounts whose payment may have been delayed or interrupted by the filing of these Cases.

***Request for Emergency Consideration of Certain "First Day" Motions***

58. Emergency consideration of the First Day Motions is critical to the maintenance of the Debtors' estates. The Debtors currently lack sufficient liquidity to support its operations. The Debtors need emergency consideration of the First Day Motions to meet payroll and other current expenses, including, but not limited to, employee, utility, and tax obligations. Without emergency consideration of the First Day Motions, the Debtors operations and the value of their estates could be negatively affected.

59. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 11th day of May, 2015.

Stephen L. Spotts
President and Chief Executive Officer of
ProTom International, Inc.

**Declaration of Stephen L. Spotts in Support of the Voluntary Petitions Under Chapter 11 of Title 11 of the United States Code and Emergency First Day Motions – 13068715v.3** **Page 19 of 19**